No. 99,291

KAREN CHISM, *Appellant*, v. PROTECTIVE LIFE INSURANCE CO.
and QUALITY MOTORS OF INDEPENDENCE, INC., *Appellees*.

(234 P.3d 780)

Opinion filed June 11, 2010.

*William J. Fitzpatrick*, of Independence, argued the cause and was on the briefs for appellant.

*James P. Rankin*, of Foulston Siefkin LLP, of Topeka, argued the cause, and *Stephen M. Kerwick*, of the same firm, was with him on the briefs for appellee Protective Life Insurance Company.

*W. James Foland*, of Foland, Wickens, Eisfelder, Roper & Hofer, P.C., of Kansas City, Missouri, argued the cause, and *Rhonda K. Mason* and *John M. Brigg*, of the same firm, were with him on the brief for appellee Quality Motors of Independence, Inc.

The opinion of the court was delivered by

LUCKERT, J.: Past decisions of this court have held that an insurance company may rescind an insurance contract if an insured makes fraudulent material misrepresentations when applying for an insurance policy. A different rule applies, however, if the insurance company's agent completed the application and either knowingly entered false information or failed to ask the applicant for the information. Under those circumstances, the insurance company is estopped from rescinding the policy. This is true even if the applicant could have discovered the misrepresentation by reading the application form.

This appeal raises the question of whether the same estoppel principles apply if an insurance company's agent does not write a false answer on an insurance application but makes fraudulent misrepresentations that lead an applicant to sign an application without knowing that the signature represents there are no disqualifying health conditions. We conclude these circumstances are comparable to a situation where an insurance agent does not ask an applicant for information used to complete an application and an insurance company could be estopped from rescinding its policy. In this case, however, the insurance company disputes that the agent made misrepresentations. Because there is sharply conflicting evidence regarding the facts surrounding the completion of the

application, we hold that the district court erred in granting summary judgment.

## FACTS AND PROCEDURAL BACKGROUND

This appeal arises from Karen Chism's claim as the beneficiary on a life insurance policy issued by Protective Life Insurance Co. (Protective). The life insurance policy was offered to Karen and her husband Steve Chism during transactions related to the Chisms' purchase of a new vehicle from Quality Motors of Independence, Inc. (Quality Motors). As part of the transaction, the dealership's business manager, Dennis Urban (also referred to as "the agent"), explained that the Protective life insurance policy could be purchased and the insurance would pay off the remaining debt on the auto loan if either of them died.

According to Karen's deposition testimony, when Urban first discussed the life insurance he told them they qualified for the insurance because they were younger than 66 years of age. After the Chisms agreed to purchase the insurance, Urban used his computer to complete a portion of the insurance application form. Most of the information was data used in the paperwork relating to the sale and financing of the vehicle. This included basic biographical information about the Chisms (names, address, telephone number, age, gender, and Social Security numbers), details about the vehicle, and information about the loan. In addition, Urban filled in the amount of life insurance requested and the designated beneficiaries.

Urban printed out the application along with other documents relating to the purchase and financing of the vehicle. According to Karen, as Urban presented the life insurance application to the Chisms he "just told us how much the payments were going to be, how much the insurance was, and this is the Protective Life policy and sign down here." She denied that Urban said anything about there being certain health conditions that disqualified an applicant or that he indicated there was a portion of the application regarding preexisting health conditions that they needed to review and complete.

Both Karen and Steve signed and dated the document, and Urban signed as the licensed resident agent for Protective. Karen testified at her deposition that she did not read the application before signing. In addition, when asked if Steve had read the application, she stated: "I don't know, but I'm sure he didn't because we were just passing the deals and we signed them and passed that other one and he signed it. He didn't have time to read it I'm sure."

Urban's deposition testimony presents a sharply conflicting version of events. He testified it was not his practice to tell applicants they were qualified for insurance. In addition, according to Urban, Karen signed the documents at a different time than did Steve and both applicants had time to read the application before signing. Further, he testified he told both Karen and Steve they needed to review the application, initial where appropriate in the self-qualifying portion of the application, and then sign at the bottom.

Nevertheless, according to Karen's deposition testimony, the Chisms were not aware of the section of the application that related to health qualifications. That section began with the heading: "WARNING—YOU MUST BE ELIGIBLE TO APPLY FOR INSURANCE." Below this heading the form stated:

"You are not eligible to apply for any insurance if you have attained age 66 as of the Effective Date, if you will have attained age 69 as of the Expiration Date of the insurance; or if you are not the named Debtor or Co-Debtor in the Schedule above."

A paragraph followed that contained conditions of eligibility for disability insurance. Then, in a shaded box, another heading stated: "APPLICATION." These instructions and text followed:

"CIRCLE (item) and INITIAL (line) if any item applies to you. OTHERWISE, DO NOT MAKE ANY MARKS.
"1. I am not eligible for any insurance if I now have, or during the past 2 years have been seen, diagnosed or treated for:
    (a) A condition, disease or disorder of the brain, heart, lung(s), liver, kidney(s), nervous system or circulatory system; or
    (b) Tumor; Cancer; Uncontrolled High Blood Pressure; Diabetes; Alcoholism; Drug Abuse; Emotional or Mental Disorder; Acquired Immune Deficiency Syndrome (AIDS); the Aids Related Complex (ARC); or received test results showing evidence of antibodies of the AIDS virus (HIV Positive).

_____ _____
Debtor Initials          Co-Debtor Initials
(initial here only if you have circled any item)

"2. I am not eligible for disability insurance if I now have, or during the past 2 years have been seen, diagnosed or treated for a condition, disease or disorder of the neck, back, knee(s) or any joint(s) or for carpal tunnel syndrome.

_____ _____
Debtor Initials          Co-Debtor Initials
(initial here only if you have circled any item)

"The sales representative is not authorized to waive or change any of the insurability requirements or any provision of the Certificate.

"By signing below, I state that I have read and understand this Application and represent that I am eligible and insurable for the coverage as requested in the Schedule. I have read and understand the above Application and understand that I am not insurable for [] any coverage if I have circled (any item) and initialed application statement #1 or; disability coverage if I have circled (any item) and initialed application statement #2. I understand this insurance is not required to obtain credit. I understand and agree that I am insured only if I have signed below and agree to pay the additional cost of the insurance. I have detached and retained the 'INSURED'S COPY' of this form and Certificate for my records."

The instructions to circle and initial applicable health conditions were printed in red, as was the instruction to provide initials at the end of sections one and two if any item was circled.

The Chisms did not circle any health conditions or place initials in the applicable blanks, even though Steve suffered from diabetes. He also had a history of high blood pressure; however, the question related to uncontrolled hypertension and Karen's deposition testimony was that Steve's hypertension was under control at the time of the application.

About 7 months after purchasing the vehicle, Steve died. The death certificate listed the cause of death as sudden death. No underlying cause of death was indicated, but diabetes mellitus, hypertension, morbid obesity, and peripheral vascular disease were listed as "significant conditions contributing to death but not resulting in the underlying cause" of Steve's death. Diabetes and uncontrolled hypertension were conditions that would render a person ineligible for credit life insurance if disclosed on the Protective application.

Karen submitted a claim for benefits under the policy. Protective denied the claim and rescinded the policy based on Steve's failure to disclose disqualifying medical conditions.

In September 2006, Karen filed suit against Protective for breach of contract and against Quality Motors for negligent procurement of the policy. Ultimately, the parties filed competing motions for summary judgment. The district court granted summary judgment in favor of Protective and Quality Motors. The court found that Quality Motors "does not review the medical interrogatories section" with applicants, but the Chisms had a duty to read the application, which they failed to do, and "unknowingly enrolled themselves into a credit life insurance program they were not eligible for." Because of the Chisms' duty to read and Steve's disqualifying health conditions, the court held that Protective's subsequent denial of coverage did not constitute a breach of the insurance policy and that Protective had rightfully rescinded the contract. Moreover, because the application required an eligibility determination—or self-disqualification—by the applicants, the district court stated Quality Motors was not negligent in its presentation of the application to the Chisms.

Karen appealed, and the Court of Appeals affirmed in *Chism v. Protective Life Ins. Co.*, 40 Kan. App. 2d 629, 195 P.3d 776 (2008). Regarding the issue of rescission, the Court of Appeals concluded the Chisms made material misrepresentations on the insurance application that barred any recovery under the policy. The Court of Appeals also concluded the policy language specifically negated Steve's eligibility for coverage due to his health conditions, and the policy clearly denoted that the agent had no authority to waive Protective's insurability requirements. *Chism*, 40 Kan. App. 2d at 634. In addition, the Court of Appeals noted it was uncontroverted that the Chisms knew about Steve's health conditions, so even if the failure to disclose those conditions was not, as described by Karen, "deliberate deceit," Protective had the power to rescind the policy after misrepresentations were made with "reckless disregard" for the truth. *Chism*, 40 Kan. App. 2d at 636.

The Court of Appeals also rejected Karen's argument that Protective waived its right to rescind the insurance policy. The Court

of Appeals pointed out, *inter alia*, that Karen was bound by the provisions in the application regardless of her failure to read or understand its terms, unless her execution of it was the product of fraud, undue influence, or mutual mistake. The Chisms were, according to the Court of Appeals, not able to attribute the misrepresentations to the agent because the agent did not complete the medical portion of the application and the Chisms had "the opportunity and duty to correctly complete the portion of the application form relating to health issues." *Chism*, 40 Kan. App. 2d at 635-36. The lack of complicity or fault of the agent, according to the Court of Appeals, distinguished this case from two Kansas cases and cases from other jurisdictions cited by Karen. The Court of Appeals concluded that Protective was entitled to summary judgment. *Chism*, 40 Kan. App. 2d at 637.

Next, the Court of Appeals addressed Karen's negligent procurement claim in which she alleged that Quality Motors failed to properly present and record the medical inquiries on the application. The Court of Appeals upheld the order granting Quality Motors summary judgment, holding there was no evidence that Urban, an employee of the dealership, was an agent for the Chisms or owed any legal duty to the Chisms "when it came to their obligation to read, understand, and accurately respond to the inquiries made" about their health in the application. *Chism*, 40 Kan. App. 2d at 639.

Finally, the Court of Appeals concluded the district court did not abuse its discretion when it quashed subpoenas for depositions of certain witnesses, excused the defendants from producing certain documents, and struck a witness' affidavit. *Chism*, 40 Kan. App. 2d at 640-42.

Karen filed a petition for review in which she raised only issues relating to her breach of contract claim against Protective and its rescission of the insurance contract. She did not discuss the other issues considered on direct appeal relating to negligent procurement and discovery orders. We granted the petition, and our jurisdiction arises from K.S.A. 20-3018(b).

After Karen's petition for review was granted, she filed a supplemental appellate brief in which she asserted that she was not

"waiving" review on all issues decided by the Court of Appeals. Nevertheless, under the rules relating to appellate procedure, this court's consideration of any issue considered by the Court of Appeals in a civil case is limited to the issues raised in the petition for review or fairly included therein. Supreme Court Rule 8.03(a)(5)(c) (2009 Kan. Ct. R. Annot. 67); *cf.* Supreme Court Rule 8.03(c) (2009 Kan. Ct. R. Annot. 68) (discussing issues raised in responses to petitions for review). The appeal before this court is limited, therefore, to the issues relating to the entry of summary judgment on Karen's claim against Protective for breach of contract and Protective's rescission of the policy. The Court of Appeals' decision to affirm summary judgment in favor of Quality Motors and its ruling on the discovery issues are not impacted by our decision.

Regarding her claim that Protective breached its contract, Karen argues in her petition for review that the Court of Appeals (1) failed to review the record in the light most favorable to Karen; (2) erred by distinguishing this case from *Schneider v. Washington National Ins. Co.*, 200 Kan. 380, 437 P.2d 798 (1968), and *Cooley v. National Life & Acc. Ins. Co.*, 172 Kan. 10, 238 P.2d 526 (1951); and (3) erred by holding that the failure to read an application for credit life insurance containing self-disqualifying medical inquiries is sufficient proof of fraudulent misrepresentation justifying rescission.

## STANDARD OF REVIEW/GENERAL PRINCIPLES

The standard for summary judgment is well known:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Nelson v. Nelson*, 288 Kan. 570, 578, 205 P.3d 715 (2009).

Karen's arguments focus on the requirement that facts be considered in the light most favorable to the party opposing the summary judgment. We will discuss the areas where Karen argues the Court of Appeals failed to apply the correct standard of review in the context of our discussion of the Court of Appeals' legal conclusions.

These legal conclusions relate to the parties' competing claims regarding who is responsible for the failure to disclose Steve's diabetes (and perhaps other disqualifying health conditions) on the insurance application. The Chisms claim it was Urban's misrepresentations that caused the error and they never intended to make any representations regarding health conditions, much less a false representation. On the other hand, Protective argues Urban had no responsibility for the error and the Chisms committed fraud.

As we consider these competing arguments, three general principles further define our standard of review: (1) Fraud is never presumed; (2) fraud must be established by clear and convincing evidence; and (3) the existence of fraud is normally a question of fact. *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004).

Protective's claims are based on the general rule of law that an insurer has the right to rescind a policy ab initio for fraudulent misrepresentation in the application process. *American States Ins. Co. v. Ehrilich*, 237 Kan. 449, 701 P.2d 676 (1985). To establish fraud in this context, Protective must establish: (1) There was an untrue statement of fact made by the insured or an omission of material fact, (2) the insured knew the statement was untrue, (3) the insured made the statement with the intent to deceive or recklessly with disregard for the truth, (4) the insurer justifiably relied on the statement, and (5) the false statement actually contributed to the contingency or event on which the policy is to become due and payable. See K.S.A. 40-2205(C) (imposing fifth element); *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999) (analyzing claim of fraud by silence); *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 586, 809 P.2d 533 (1991) (stating elements one to three as stated here but stating the fourth element as "another party justifiably relied on the statement and acted to his injury and detriment"); *Ehrlich*, 237 Kan. at 452

(same); *Scott v. National Reserve Life Ins. Co.,* 143 Kan. 678, 680, 56 P.2d 76, *modified on other grounds* 144 Kan. 224, 58 P.2d 1131 (1936) (recognizing fraud to be a known misrepresentation or a nondisclosure).

Other than the legislative refinement of the fifth element, these elements parallel those of a fraud claim generally. See *Alires*, 277 Kan. at 403 (stating elements of fraud as "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment").

## ESTOPPEL

The primary thrust of Karen's petition for review is her argument that Protective is estopped from rescinding the contract because of its agent's wrongdoing. In response, Protective does not deny that Urban acted as its agent, but it denies that Urban is in anyway responsible for the false statement on the application. Protective's view, which was adopted by the district court and the Court of Appeals, is that Protective can be estopped only if Urban placed false information on the application. To support this position, Protective cites *Schneider v. Washington National Ins. Co.,* 200 Kan. 380, 437 P.2d 798 (1968), and *Cooley v. National Life & Acc. Ins. Co.,* 172 Kan. 10, 238 P.2d 526 (1951), which were both discussed by the district court and the Court of Appeals.

In the earliest of these cases, *Cooley*, 172 Kan. 10, a father discussed purchasing life insurance for his three daughters with a life insurance agent and the agent's supervisor. According to the father, he explained he was not interested in purchasing policies unless he could do so for the benefit of all of his daughters and he was concerned that one diabetic daughter would not qualify for coverage. He told the agent that the diabetic daughter had not seen a doctor for some time and was "getting along all right." The agent and supervisor asked to see the daughter, so the father sent them to the family home and indicated the mother could complete the application. Once at the home, the agent filled out the application, asking the mother questions and completing the application with

her answers. According to the mother, when the agent reached a question about diabetes, the agent indicated the father had already answered the question. The mother testified she signed the application but did not read it. The life insurance agent and his supervisor disputed the father's and mother's testimony by asserting the mother had answered "no" to the question about diabetes and that they had no knowledge one of the applicants had that health condition.

This court affirmed the district court's determination that the disputed facts created a jury question, stating:

"The rule in this state is that an insurance agent in making out an application for insurance acts as the agent of the company and not of the applicant, and if the applicant makes truthful answers to the questions propounded, the company cannot generally take advantage of false answers entered by the agent contrary to the facts as stated by the applicant. . . . The rule stated represents the great weight of authority. [Citations omitted.] No reason is suggested, and we know of none, why an applicant for insurance, who is not asked a question contained in the application, but to which an agent enters a false answer, is not entitled to a rule as favorable as that stated." *Cooley*, 172 Kan. at 15-16.

Subsequently, this court considered similar facts in *Schneider*, 200 Kan. 380. There, two insureds testified that an insurance agent filled in an application without consulting with or directing questions to the applicants. In sharp conflict with this testimony, the agent testified he filled out the application with the specific answers given by the applicants.

The court discussed the holding in *Cooley*, on which the *Schneider* court relied, and provided additional authorities and explanation for the holding by stating:

"The rule adhered to by this court in *Cooley* is stated in 17 Appleman, Insurance Law and Practice § 9401:

'An insurer is estopped from setting up a defense of fraud or negligence on the part of the insured in answering application questions, where such fraud or negligence was on the part of the insurer's agent. This rule applies with particular force where the false answers are inserted by the agent without the knowledge of the applicant, regardless of whether such statements be considered representations or strict warranties. Thus, where an application is prepared without even consulting or interrogating the insured, and the insured had no knowledge of the making of such statements, much less their verity, an estoppel is certain to arise.

'Likewise, an insurer waives or is estopped to rely on representations contained in an application where the agent fills in the application without propounding any of the questions to the insured. Where an agent assumes the responsibility for answering the questions asked in the application, and answers falsely or incorrectly without the applicant having made any statements in connection therewith or knowing the manner in which they were answered, the insurer will be estopped to claim that the representations were false or incorrect. The insured cannot be called upon to bear the consequences, where the application is filled in by the agent from his own knowledge or from information in his possession.' " *Schneider*, 200 Kan. at 395.

Under the facts in *Schneider*, where the applicants testified the agent completed the application without asking the applicants for the necessary information, this court held the insurer could be estopped from rescinding the application under these general rules.

Because there was conflicting testimony regarding whether the agent asked the questions, this court further held that the district court erred in granting summary judgment, stating: "In cases where the truth of the representations or the facts surrounding the taking of the application are in dispute the questions presented are for a jury's determination." *Schneider*, 200 Kan. at 393.

Karen argues the same conclusion applies in this case because questions of fact exist regarding the taking of the application. She complains the district court and the Court of Appeals ignored the factual questions and resolved the conflicting testimony in favor of Protective. For example, she points to the Court of Appeals' statement that Urban "handed the application to the Chisms to complete, review, and sign." *Chism*, 40 Kan. App. 2d at 630. She suggests the evidence, when viewed in the light most favorable to her, establishes: (1) Urban completed the form or at least led the Chisms to believe he had; (2) Urban did not give any indication they should review the information or the questions; (3) Urban told the Chisms they qualified because of their age, leaving the impression there were no additional qualifying conditions; and (4) Urban pointed out where they should sign at the bottom of the form without pointing out the blanks for their initials in the portion of the form relating to health qualifications.

In addition, she argues that had the district court and the Court of Appeals considered the evidence in her favor, neither court would have distinguished either *Cooley* or *Schneider*. To test this assertion, we will examine the basis on which each of those courts distinguished those cases.

First, the district court found *Schneider* and *Cooley* distinguishable in that Urban did not exert "the kind of control over the application process contemplated in" those two decisions. The district court noted that in those cases "the agent either knowingly made a false statement on the application or the insurance company itself failed to ask the appropriate questions. Neither occurred in the case at bar." Similarly, the Court of Appeals concluded that Urban filled out only background facts, not facts related to information about material health conditions—information which was to be supplied by the Chisms. The Court of Appeals concluded this distinguished the prior cases because, as the court explained:

"We are not confronted with a situation where the insured gives the procuring agent a verbal answer to a health question on the application and the agent writes down something entirely different on the application. Indeed, Karen claims that [the agent] failed to question them at all about their health conditions." *Chism*, 40 Kan. App. 2d at 635.

Karen does not dispute the factual component of this analysis, but she does question the legal conclusion that the agent's alleged misrepresentations cannot estop Protective. Karen argues that to apply an estoppel rule only if the agent physically writes on the application insulates an insurer from the consequences of its agent's fraud simply because of the manner in which the application's health inquiry is phrased. She urges us to hold that an agent's fraud estops an insurance company from rescinding a contract if the agent's fraud causes the submission of an inaccurate application, as long as the applicant acted in good faith.

We agree with Karen's argument. If the facts are accepted in the light most favorable to Karen, Urban led the Chisms to believe he had completed the application and had obtained all of the necessary information. Further, his misrepresentation that the Chisms qualified for the insurance because of their age suggested there were no health qualifications. Then, according to Karen, Urban

told them to sign on the bottom of the form without directing their attention to the disqualifying conditions. This is significant in light of Protective having written the application so that an applicant who signs the form without circling a disqualifying health condition effectively answers, "No, there are no disqualifying medical conditions." Under those circumstances, an agent who directs the applicant to sign the form, knowing the applicant is unaware of and has not answered potentially disqualifying medical inquiries, has assumed responsibility for answering the questions and has caused the submission of a false answer. The legal effect of this action is not different from the effect of an agent not asking qualifying questions of the applicant and submitting a false answer, which was the situation in *Schneider*.

Nevertheless, the Court of Appeals also concluded there was no evidence to establish that the agent knew the Chisms did not read the application. The Court of Appeals stated: "Urban testified that the Chisms did not immediately sign the document when he handed it to them. Karen had it before her for an adequate time for her to read it before signing it. Urban stated, 'She did not do anything to my indication that she did not read it.' " *Chism v. Protective Life Ins. Co.*, 40 Kan. App. 2d at 634. However, as Karen points out, when Urban was asked if he saw Karen read the application, he replied that he could not answer that question. In addition, Karen's testimony was that the Chisms were passing the various documents between each other and signing without taking time to read any document. Her description of the transaction controverts Urban's version and creates an issue of fact regarding whether Urban accepted responsibility for answering the health qualification questions when he allegedly directed the Chisms to sign the form without review.

Even so, the Court of Appeals and the district court concluded the Chisms had a duty to read the application, which prevented their reliance on the agent's actions. As the Court of Appeals noted, Kansas has long adhered to the general rule that an insurance applicant has a duty to understand the contents of a policy application before signing it and to answer all questions fairly and truthfully. Yet, when this rule is stated it is generally qualified by the phrase

"absent fraud, undue influence, or mutual mistake." See, *e.g., Albers v. Nelson*, 248 Kan. 575, 579, 809 P.2d 1194 (1991); *Ridgway v. Shelter Ins. Co.*, 22 Kan. App. 2d 218, 225, 913 P.2d 1231, *rev. denied* 260 Kan. 995 (1996).

Karen invokes the exception, arguing Protective cannot be relieved of its agent's misrepresentations because of her and Steve's failure to read the form. The *Schneider* court discussed this point, noting there was a split of authority with some courts imposing a duty to read a contract even if an insurance agent commits fraud. The *Schneider* court opted for what it termed the more "lenient" view, however, stating:

" 'An applicant has no absolute duty to read a policy in anticipation of fraud or mistake of an agent, so that even though the application contains a warranty that all answers to questions were correct, this has been held only a warranty that the answers actually made by the insured were correct, and not that the agent had correctly transcribed them. Nor would the fact that the application recites that the falsity of answers bars recovery require the insured to read his application to see if the agent correctly wrote his truthful answers therein. The mere fact that an applicant signs the application in good faith without reading it has been considered not such negligence as would render him liable for the agent's fraud or mistake in inserting answers false in character, and would not preclude recovery under this rule. Such failure to read would not, therefore, necessarily be a bar to recovery.

" 'An insured has a right to presume that the policy received by him is in accordance with his application, and his failure to read it will, under this rule, not relieve the insurer or its agent from the duty of so writing it. . . .' " *Schneider*, 200 Kan. at 396 (quoting 17 Appleman, Insurance Law and Practice, § 9406, pp. 31-32).

The *Schneider* court concluded the insurance company could not base its claim for rescission on the applicant's failure to read the application and discover that the agent had incorrectly completed it. *Schneider*, 200 Kan. at 397. In both *Cooley* and *Schneider*, the applicant or the applicant's authorized agent had the opportunity to review and sign the application. That ability to review the application did not remove the issue from the jury's consideration.

Similarly here, if Karen's version of the facts are accepted, the Chisms did not have a duty to read the application to determine whether Urban misrepresented to them the qualification criteria

for the insurance, causing them to believe there were no qualifying questions for them to answer. Hence, Karen has created questions of fact and, if a jury were to accept her version of events, Protective could be estopped. Given this conclusion under Kansas law, we need not consider the out-of-state authorities cited by Karen.

## RESCISSION

On the other hand, if a jury were to accept Urban's version of the facts, Protective would not be estopped from asserting the Chisms misrepresented Steve's health condition and the jury would have to consider whether Protective met its burden of proving by clear and convincing evidence that the Chisms committed fraud. Karen argues there are questions of material fact on many of the elements of fraud, including the nature of the misrepresentation, whether the undisclosed health conditions actually contributed to Steve's death, and whether the misrepresentation was intentional or made with reckless disregard for the truth. As Karen notes, the element of their intent is intertwined with the question of whether Urban misled them and whether they reasonably relied on his misrepresentations. Because issues of fact exist on this one element, a jury question exists as to whether there was fraud. The jury must consider each element and determine if the burden of proof has been satisfied.

Nevertheless, the parties' arguments raise legal issues we will address to provide guidance on remand.

### Intent/Duty to Read

The first issue relates to Karen's argument that an intent to deceive cannot be implied from a mere failure to read an insurance application. In making this argument, Karen appears to interpret the Court of Appeals' decision as adopting a "simple negligence" standard for fraud. We do not read the Court of Appeals' decision in this way. Nevertheless, her arguments raise the question of what level of intent is required to establish a misrepresentation or omission that would justify the rescission of an insurance contract.

Several states have adopted the rule that an insurance policy may be rescinded based on a negligent misrepresentation. See, *e.g.*,

*John Hancock Mut. Life Ins. Co. v. Weisman,* 27 F.3d 500, 504 (10th Cir. 1994) (New Mexico law); *Munroe v. Great American Ins. Co.,* 234 Conn. 182, 188 n.4, 661 A.2d 581 (1995); *Curtis v. America Community Mut. Ins. Co.,* 610 N.E.2d 871, 874 (Ind. App. 1993). Kansas has not adopted this rule, however. Rather, Kansas courts have consistently recognized that an insurer may not rescind a policy on a mere negligent misrepresentation or omission, except where contracting, sophisticated commercial entities agree that standard should apply. *E.g., National Bank of Andover v. Kansas Bankers Surety Co.,* 290 Kan. 247, 261, 225 P.3d 707 (2010); *Scott v. National Reserve Life Ins. Co.,* 143 Kan. 678, 680, 56 P.2d 76, *modified on other grounds* 144 Kan. 224, 58 P.2d 1131 (1936).

On the other hand, Kansas has recognized that an insurer may rescind a life insurance policy after a misrepresentation is made on the insurance application with reckless disregard for the truth. See *Alires v. McGehee,* 277 Kan. 398, Syl. ¶ 3, 701 P.2d 676 (1985); *Waxse v. Reserve Life Ins. Co.,* 248 Kan. 582, 586-87, 809 P.2d 533 (1991); *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 467, 738 P.2d 1210 (1987); *Scott,* 143 Kan. 678; *Sharrer v. Insurance Co.,* 102 Kan. 650, 652, 171 Pac. 622 (1918); see also *St. Amant v. Thompson,* 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968) (stating that reckless disregard for the truth in libel claims requires that defendant "in fact entertained serious doubts as to the truth" of the statement made); Restatement (Second) of Contracts § 164 (1981) (when party induced to enter contract by fraudulent or material misrepresentation upon which party justified in relying, contract voidable).

In addition, Karen argues the Court of Appeals, whether using a simple negligence or reckless disregard for the truth standard, erred in holding the standard is met if an insurance applicant signs an unread application. She argues this holding is contrary to *Schneider* and *Cooley.*

While *Schneider* and *Cooley* hold an insurance company cannot rely on the failure to read as a defense to an agent's fraud, they do not excuse an applicant from reading an application if there is no fraud, undue influence, or mutual mistake. Indeed, this court has previously stated the "failure to obtain a reading and explanation

of [a contract before signing] is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents." *Maltby v. Sumner*, 169 Kan. 417, Syl. ¶ 5, 219 P.2d 395 (1950). This holding is consistent with cases from other courts establishing that signing a document without reading it is evidence of a reckless disregard for the truth of statements contained in the document. See *United States v. Thomas*, 484 F.2d 909, 912-13 (6th Cir.), *cert. denied* 414 U.S. 912 (1979) (suggesting that defendant could be convicted of knowingly making false statement on firearms registration application, even if he did not actually read the form he signed and no questions were read to him, if by signing statement without reading it he acted with reckless disregard of whether the statements made were true or with conscious purpose to avoid learning the truth); *United States v. Squires*, 440 F.2d 859, 864 (2d Cir. 1971) (defendant can be convicted of " 'knowingly' " making false statement by signing form without reading it, if he deliberately avoided reading it and, if he had read it, he would have been " 'aware of a high probability' " that he was prohibited from obtaining firearm).

Hence, if the jury were to accept Urban's version and conclude he did not commit fraud, the jury could determine the Chisms acted with a reckless disregard for the truth when they failed to read the application. Again, resolution of the issue requires the weighing of the conflicting evidence regarding the facts surrounding the taking of the application. Because of the disputed facts, the district court erred in granting summary judgment.

*Materiality*

Finally, we consider whether the Court of Appeals applied the wrong standard to determine the materiality of the alleged misrepresentations regarding Steve's health. The Court of Appeals stated:

"The test of the materiality of a false statement in an application for life insurance is whether the misrepresentation could reasonably be considered to affect the insurer's decisions regarding the degree or character of the risk it is being asked to underwrite, whether to issue the policy, or what premium it should charge for the policy. See *Schneider v. Washington National Ins. Co.*, 200 Kan. 380, 397, 437 P.2d 798 (1968). The same test applies in considering a false statement in an application for life insurance." *Chism*, 40 Kan. App. 2d at 634.

Although this statement ·accurately reflects the holding in *Schneider*, the test as stated in *Schneider* was derived from a prior version of K.S.A. 40-2205(C), which provided an "acceptance of the risk" standard for measuring materiality. The current standard for determining materiality of the representation is stated in two statutes.

First, K.S.A. 40-2205(C) states:

> "The falsity of any material statement in the application for any policy covered by this act may not bar the right to recovery thereunder unless the false statement has actually *contributed to* the contingency or event on which the policy is to become due and payable." (Emphasis added.)

Likewise, K.S.A. 40-418, found in the general provisions relating to life insurance companies, utilizes the "contributed to" language and provides:

> "No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this state, shall be deemed material or render the policy void unless the matter misrepresented shall have *actually contributed to* the contingency or event on which the policy is to become due and payable." (Emphasis added.)

See Andreas, *Misrepresentation In Insurance Applications: Kansas Law*, 62 J.K.B.A. 22, 24 (May 1993) ("Under Kansas law, an insured may lie or conceal material information in an application for life or health insurance and still recover benefits, as long as the matter misrepresented did not contribute to the loss."); 44 C.J.S. Insurance § 498, p. 611 (under statute, "a disease existing at the time of the issuance of the policy must cause or contribute to the insured's death to excuse the insurer from liability"); 45 C.J.S. Insurance § 1064, p. 547 ("Where a statute provides that no misrepresentation will avoid the policy unless the matter misrepresented actually contributed to the death of the insured, such a statement is no defense to an action on the policy, even though willfully false.").

Applying K.S.A. 40-2205(C) and K.S.A. 40-418 to the present case, the jury must determine whether Steve's diabetes (and perhaps other conditions if it is determined those conditions should

have been disclosed) "actually contributed to" his death for which payment under the policy is sought.

Even though the Court of Appeals stated materiality was to be tested by whether the insurer accepted a risk, we note that the court actually applied the "actually contributed to" statutory test. In doing so, the Court of Appeals concluded the treating physician "did not negate the notion that Steve's medical conditions contributed to his death." *Chism*, 40 Kan. App. 2d at 633. Karen asserts this conclusion is another example of the Court of Appeals' and district court's weighing of the evidence. She points to her testimony that Steve's hypertension was controlled at the time of the application. Further, she points to testimony of Steve's treating physician, in particular his opinion that the cause of Steve's sudden death cannot be determined. She submits that this testimony places into question whether Protective can prove by clear and convincing evidence that diabetes or hypertension were material to the cause of death. Again, these factual questions make summary judgment inappropriate.

The Court of Appeals' decision on the issues before this court is reversed. The decision of the district court on the issues before this court is reversed and remanded.