No. 100,286

KEELY FOSTER, a Minor, through her Parents and Natural Guardians, KIM FOSTER and KEVIN FOSTER, and Individually on their own behalf, *Appellants*, v. MICHELLE A. KLAUMANN, M.D., *Appellee.*

(294 P.3d 223)

Opinion filed January 11, 2013.

*W.J. Fitzpatrick*, of Fitzpatrick and Bass, of Independence, argued the cause, and *Douglas A. Buxbaum* and *John M. Fitzpatrick*, of Buxbaum, Daue & Fitzpatrick, PLLC, of Missoula, Montana, were with him on the briefs for appellants.

*Michael R. O'Neal*, of Gilliland & Hayes, P.A., of Hutchinson, argued the cause, and *Shannon L. Holmberg*, of the same firm, was with him on the briefs for appellee.

*Kyle J. Steadman*, of Foulston Siefkin LLP, of Wichita, for *amicus curiae* Kansas Association of Defense Counsel.

*James R. Howell*, of Prochaska, Giroux & Howell, of Wichita, and *David R. Morantz* and *Matthew E. Birch*, of Shamberg, Johnson & Bergman, of Kansas City, Missouri, for *amicus curiae* Kansas Association for Justice.

The opinion of the court was delivered by

BILES, J.: This is a medical malpractice case challenging jury instructions used at trial. Keely Foster, a minor, and her parents, Kim and Kevin Foster, sued Dr. Michelle Klaumann, a pediatric

orthopedic surgeon, for injury to a nerve in Keely's leg during a surgery to remove tumors. The jury unanimously found Klaumann not at fault. A divided Court of Appeals panel reversed and remanded for a new trial. We consider: (1) whether it was error to instruct the jury on both a general physician standard of care and a specialist standard of care when the parties do not dispute Klaumann is a specialist; and (2) whether the "best judgment" instruction improperly suggests that a physician's subjective beliefs should be considered when establishing negligence because it states the physician has a right to use his or her best judgment when determining the course of treatment.

Although we suggest improvements should be made to the standard PIK instructions from which those instructions were taken, we hold that reversal is not required. We reverse the Court of Appeals and affirm the district court based on the jury's verdict for the doctor.

### FACTUAL AND PROCEDURAL BACKGROUND

Keely has multiple hereditary exostosis, a condition causing osteochondromas or bone tumors to grow around the ends of the long bones. The osteochondromas stop forming once a child matures, and most tumors are benign. But they can cause permanent conditions such as pain, loss of motion, deformity, or joint alignment problems.

Klaumann began treating Keely in 1999 when Keely was 5 years old. For the first 6 years, the doctor monitored Keely's condition with periodic examinations and X-rays to track the size and location of any osteochondromas.

In March 2005, Klaumann recommended surgery because Keely was experiencing consistent pain in an area without much soft tissue and those symptoms could relate to a bursa deformity or nerve irritation. Keely's mother; Kim Foster, agreed to surgery. But the parties disputed which tumors she and the doctor agreed would be removed.

Klaumann testified she planned to excise four tumors with two incisions—two tumors on the distal femur, the hook-shaped osteochondroma between the tibia and the fibula, and one on the prox-

imal fibula. But Keely's mother testified that she agreed only to removing two tumors, which she described as "one on top of her leg and then one on the inside of her leg, just below the knee." A note from Klaumann's office in March 2005 summarized the surgery as: "[Kim] would like to have the femoral and proximal fibular osteochondromas removed. This will be done after school is out in late May."

On the day of surgery in May, Klaumann met with Keely's parents, and the scope of the surgery changed. But again the two sides dispute what tumors the parties agreed were to be removed. The Fosters contend the incision endangering the nerve was added the day of surgery, while Klaumann claims the incision added could not have caused the nerve damage that occurred.

After the procedure, Keely experienced foot drop in her left foot. She could not extend her left toes and had numbness. In the following weeks, Keely was still unable to move her foot up (dorsiflexion) or out (eversion). Dorsiflexion is controlled by the deep peroneal nerve, and eversion is controlled by the superficial peroneal nerve. Keely underwent a second surgery with Dr. Rahul Nath, a surgeon specializing in complex nerve injuries, to attempt to restore function in her foot. Keely's peroneal nerve function had not improved 1 year after the second surgery. According to Nath, it is unlikely to return.

Keely's parents filed suit individually and on behalf of their daughter, alleging Klaumann committed medical malpractice. In the pretrial conference order, the Fosters alleged Klaumann violated the applicable standard of care by: (1) failing to give and document an appropriate informed consent; (2) failing to document there was an appropriate indication for surgical removal of the osteochondromas removed during surgery; (3) failing to comply with the standard of care by not identifying the neurovascular structures in order to avoid nerve injury during surgery; (4) transecting the deep peroneal nerve and injuring her superficial and/or common peroneal nerve; (5) failing to recognize and/or report that she transected and injured the nerve during surgery so that Keely could receive prompt specialty consultation; and (6) failing

to properly and timely diagnose and treat Kelly's postoperative neurologic injury and to refer Keely to a specialist.

## The Jury Instructions

During trial, both parties agreed regarding the surgical claims that Klaumann held herself out as a specialist, so the specialist standard of care instruction, PIK Civ. 4th 123.12, should be issued. But at the jury instruction conference, the parties disputed whether the general physician standard of care instruction from PIK Civ. 4th 123.01 and best judgment instruction from PIK Civ. 4th 123.11 also should be given. The Foster's argued neither was appropriate, while Klaumann argued both were required.

The district court agreed with the doctor. It held the general physician standard of care instruction should be issued because the Fosters' informed consent claim was a general duty as a matter of law. The district court judge further stated, "I think the courses of treatment in this case [are] a . . . gray area mixed between both [the specialist and the general physician standards of care] and that there is sufficient evidence in order to argue that there's been the [applicable] standard presented by both sides."

Regarding the best judgment instruction, the district court held that it should be given because there was testimony on different courses of treatment. It defined those as the expansion of the surgery and "the recommendation as to whether to do one incision, two incisions, each of those variations is a course of treatment." After further argument, the court stated that it might not have given the instruction if the only issue was whether to do the surgery or not, but "the evidence that [the Fosters] presented has to do [with] and was directed toward the change between what [the Fosters] thought was going to happen . . . in March and what the defendant came in and said let's do in May." The district court explained further that the jury should be given the best judgment instruction because Klaumann went from two incisions to three.

## Verdict and Posttrial Motions

The Fosters' claims were submitted to the jury, which unanimously found the doctor was not at fault. The Fosters argued for

new trial based on numerous claimed errors, including the district court's issuing the general physician standard of care and best judgment instructions. The district court denied the motion.

Regarding the two claimed jury instruction errors, the court observed the PIK Notes on Use approve instructing the jury on both the general physician and specialist standards of care when both are appropriate. (See PIK Civ. 4th 123.11, Notes of Use: "If there is a dispute as to which standard is applicable in light of the evidence in the case, both instructions should be given, with the appropriate modifications . . . if necessary to avoid confusion for the jury;" PIK Civ. 4th 123.01, Notes on Use [similar statements].). The court also reiterated the best judgment instruction was appropriate "given the issue of how one would treat the number of incisions and the number of osteochondromas to be removed at the time of surgery [and] given that there was a long time while everybody knew that the osteochondromas were there but surgery was not indicated or arguably not indicated."

At the Court of Appeals, the Fosters again argued numerous trial errors, including that it was improper to issue the general physician standard of care instruction and the best judgment instruction. They contended these instructions could have misled the jury. A divided Court of Appeals agreed, reversing and remanding the case for a new trial. *Foster v. Klaumann*, 42 Kan. App. 2d 634, 216 P.3d 671 (2010).

The panel's majority held that the best judgment instruction could have improperly focused the jury on Klaumann's subjective beliefs in determining the appropriate treatment, instead of basing its decision on the objective standard of care. 42 Kan. App. 2d at 666. And as to the standard of care instructions, the majority concluded the district court should have modified the instructions to inform the jury this claim was governed by the lower standard of care. It held the failure to make those modifications could have misled the jury and required reversal. 42 Kan. App. 2d at 652-54.

Judge G. Joseph Pierron dissented on both instruction issues. He found that issuing the general physician standard of care instruction could not have misled the jury because "[a]t worst it is surplusage." 42 Kan. App. 2d at 691. He also indicated the majority

panel overlooked cited Kansas caselaw approving the best judgment instruction, noting "there is nothing to indicate that Kansas appellate court approval of the instruction had waned." 42 Kan. App. 2d at 691-92.

Klaumann petitioned this court for review of the two jury instruction issues. Our jurisdiction arises under K.S.A. 20-3018(b) (review of Court of Appeals decision).

## ANALYSIS

The Fosters argue two erroneous jury instructions require reversal and remand for a new trial. First, they assert the district court could have confused or misled the jury by giving both the general physician and specialist standard of care instructions from PIK Civ. 4th 123.01 and PIK Civ. 4th 123.12. They argue that only PIK Civ. 4th 123.12 should have been issued because it establishes the specialist standard of care applicable to all their claims. Second, they argue the district court erred by giving PIK Civ. 4th 123.11 (Physician's Right to Elect Treatment to be Used). The parties and some caselaw refer to this as the "best judgment" instruction. We adopt that terminology for this case even though it does not capture all of the instruction's substance.

*Standard of Review*

This court recently held that its prior decisions applied an "imprecise" standard of review for jury instruction issues and set forth an analytical framework with accompanying standards of review to promote greater consistency. *State v. Plummer*, 295 Kan. 156, 160, 283 P.3d 202 (2012). We now implement the following four-step process:

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and de-

gree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *Plummer*, 295 Kan. 156, Syl. ¶ 1.

Under step one, the Fosters objected to both instructions at trial, preserving these issues for appeal. Under steps two and three, trial courts are required to give an instruction supporting a party's theory of the case if "the instruction is requested and there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, is sufficient for reasonable minds to reach different conclusions based on the evidence." *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010). Because two different instructions are challenged, we examine steps two through four in the sections related to each instruction.

A. *The General Physician Standard of Care Instruction*

To establish medical malpractice, a plaintiff must show: (1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 15, 289 P.3d 1098, (2012).

The duty of care owed by all physicians, regardless of the particular medical specialty in which a physician practices, is to exercise reasonable and ordinary care and diligence. But the particular decisions and acts required to satisfy that duty of care vary, *i.e.*, the required skill depends on the patient's situation and the physician's medical specialty, if applicable. What constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine involved. *Durflinger v. Artiles*, 234 Kan. 484, 490, 673 P.2d 86 (1983), *disapproved on other grounds by Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995).

PIK Civ. 4th 123.01 (Duty of Health Care Provider) and PIK Civ. 4th 123.12 (Duty of Medical Specialist) are intended to inform the jury about the applicable standards of care. Both were issued

in this case. As given, the more general physician standard of care instruction stated:

"In performing professional services for a patient, a physician has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in which the physician practices and under like circumstances. In the application of this skill and learning the physician should also use ordinary care and diligence. A violation of this duty is negligence.

"A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made."

The specialist standard of care instruction stated:

"A surgeon who holds herself out to be a specialist in a particular field of medicine must use her skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the time of the treatment and diagnosis. A violation of this duty is negligence.

"A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made."

The only modification from the standard PIK instructions was the addition of the second paragraph for both instructions. And the parties agree this addition was appropriate because it explained the causation element for the medical malpractice claim.

The Fosters have consistently argued that all claims are governed by the specialist standard of care. And based on that, they argue the specialist instruction, PIK Civ. 4th 123.12, applied. Klaumann has never disputed that at least some of the Fosters' medical malpractice claims were governed by the specialist standard of care. Thus, under our new framework, the parties agree the specialist instruction was both legally appropriate and factually supported under steps two and three of the jury instruction analysis. The parties dispute whether it was proper to issue the general physician standard of care instruction, PIK Civ. 4th 123.01.

Since the Fosters contend the specialist standard of care is the only standard applicable to their claims, they argue it was improper to issue the general physician standard of care instruction. This was initially a disputed point because Klaumann maintained to the district court and the Court of Appeals that the general physician

standard of care governed the informed consent claim. And based on that, Klaumann argued the general physician standard of care instruction was both legally appropriate and factually supported.

During the jury instructions conference, Klaumann said the informed consent claim was governed by the general physician standard of care because all physicians are required to get informed consent, stating:

"I did not pick up during the trial that the duty for informed consent was a duty that's limited to specialists. I mean that is a duty that common malpractice law in Kansas applies to every single physician. Indications for treatment alternatives, that sort of thing are things that all physicians do and all physicians have a duty to do. Where it gets into the specialty is because we're doing a surgery and we acknowledge that surgery is implicated . . . and [it] would be appropriate to give the instruction on the specialist because of that surgery."

Klaumann repeated this argument in her brief to the Court of Appeals, where she stated: "The district court in this case correctly noted that the informed consent claim could, and in this case should, be subject to a generalist instruction."

Notably, both lower courts adopted Klaumann's argument that the informed consent claim was governed by the general physician standard of care. But her argument changed in her briefs to this court.

Klaumann now argues that "[w]hile counsel and the court may have believed the [general physician standard of care from PIK Civ. 4th] 123.01 applied to the informed consent claims, there was no dispute *in the evidence* that [Klaumann] was a specialist." And she criticizes the Court of Appeals for concluding that the evidence was confusing as to whether the general physician standard of care or the specialist standard of care should be applied to the Fosters' informed consent claim, stating: "All standard of care testimony was given by specialists and pertained to a specialist. . . . No one offered testimony about what a general physician would be expected to do in the context of Keely Foster's surgery." Finally, during oral argument to this court, Klaumann argued the general physician standard of care instruction was appropriate because it is a prelude to the specialist instruction and shows the jury the specialist standard of care applies to the Fosters' claims.

Under our analytical framework for deciding jury instruction issues, these concessions eliminate our need to determine whether the general physician standard of care instruction was legally appropriate under step two or whether it was supported by the evidence in step three. Klaumann agrees that all of the Fosters' claims are governed by the specialist standard of care. This admission focuses our inquiry on step four to consider whether it was harmless error to issue the general physician standard of care instruction when all the evidence established the standard of care of a specialist.

In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), we held:

"[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial."

Based on the language from our decisions predating *Plummer*, Klaumann argues issuing both instructions could not have misled the jury because the general physician standard of care instruction compliments the specialist instruction by establishing that Klaumann must be held to the higher standard of care of a specialist. For this, Klaumann relies on *Douglas v. Lombardino*, 236 Kan. 471, 693 P.2d 1138 (1985).

In that case, Patricia Douglas died following administration of a local anesthetic for a Caesarean section. Her family sued the anesthesiologist for medical malpractice, arguing inappropriate administration of the anesthetic and subsequent incorrect and substandard behavior caused Douglas' death. The anesthesiologist denied negligence, arguing Douglas died from an adverse drug reaction. Both the general physician and specialist standard of care instructions were submitted to the jury. Plaintiffs argued the in-

structions could mislead the jury because the only trial evidence indicated the anesthesiologist was a specialist.

The *Douglas* court held that the specialist instruction more clearly defines the specialist's duty, but the two instructions were not inconsistent. 236 Kan. at 479. And since there was no dispute the anesthesiologist was a specialist and all standard of care testimony was clearly related to a specialist's standard, this court concluded the jury could not have been confused. 236 Kan. at 479-80. But in doing so this court cautioned that giving both instructions could be confusing—if there had been a dispute in the evidence as to whether the anesthesiologist was a specialist. 236 Kan. at 480. The *Douglas* court also held that submitting the general physician standard of care instruction "gave the jury a frame of reference so they could see [the anesthesiologist] was being held to a higher degree of care than a general practitioner." 236 Kan. at 480.

The Fosters urge us to overrule *Douglas*. And the Court of Appeals majority decision criticized the conclusion in *Douglas* that also giving the general physician standard of care instruction provided a frame of reference for the specialist instruction, stating it was "a subtlety not warranted by the law." *Foster*, 42 Kan. App. 2d at 652. The panel also implied that *Douglas* is inconsistent with *Simpson v. Davis*, 219 Kan. 584, 587, 549 P.2d 950 (1976). *Foster*, 42 Kan. App. 2d at 652 ("It is noteworthy that unmentioned in *Douglas* is the case of *Simpson v. Davis*.").

In *Simpson*, a dentist dropped a device down the patient's throat during a procedure designed to eliminate complications following a root canal. The patient swallowed the device, causing numerous problems including puncturing her stomach. Dentists are held to the same objective standard of care as physicians. See 219 Kan. at 587. And this dentist had told the patient that root canal work was a specialized field that he was capable of performing. The jury was instructed that the dentist undertook the duty of a specialist by agreeing to perform the work and had the duty to use the care and skill of a specialist. This court affirmed the determination that the dentist was acting as a specialist under these circumstances, stating:

"It is the generally accepted rule that a physician or surgeon or dentist who holds himself out to be a specialist is bound to bring to the discharge of his

professional duties as a specialist that degree of skill, care and learning ordinarily possessed by specialists of a similar class, having regard to the existing state of knowledge in medicine, surgery and dentistry, that is, a higher degree of skill, care and learning than that of the average practitioner. [Citations omitted.]" 219 Kan. at 587.

But *Simpson* merely confirms what the parties have conceded—that Klaumann, as a specialist, must be held to the standard of care of a specialist. So the question remains whether issuing the general physician standard of care instruction was erroneous when the only trial evidence established the standard of care of a specialist.

We decline to overrule our *Douglas* decision as the Fosters request. Issuing the general physician standard of care instruction could not have affected the trial's outcome because the only standard of care evidence presented was that of a specialist. In this context, these instructions are not necessarily inconsistent. The general physician instruction informs the jury that physicians have a duty to use a certain degree of skill and the skill level required is based on an objective standard developed by physicians practicing in the same field. The specialist instruction then reiterates that a higher degree of skill is required for specialists and the objective standard is established by other specialists.

We also agree with Judge Pierron's dissent stating that the general physician standard of care instruction was at worst superfluous in this context. See *Foster*, 42 Kan. App. 2d at 691. Nevertheless, this is not a ringing endorsement for giving both instructions.

These instructions could be improved upon, and we encourage the PIK Committee to revisit them. One problem is that the PIK instructions do not suggest how to modify the PIK instructions to identify what claims may be governed by different standards of care. Quite possibly, that sort of ambiguity led to Klaumann's change of heart regarding the standard of care applicable to the informed consent claim on appeal. And while this may provide greater flexibility for appellate argument, it does not provide clarity to jurors.

There is a second problem because several other PIK instructions, including the best judgment instruction discussed below, reference the applicable standard of care. And as demonstrated in

this case, that practice can lead to inconsistencies within the jury instructions as a whole because the other instructions are not always modified to reflect the standard of care instructions issued.

B. *The "Best Judgment" Instruction*

PIK Civ. 4th 123.11, which the parties refer to as the "best judgment" instruction, was also issued over the Fosters' objection. The PIK instruction was not modified, but the parties designated Klaumann as a specialist where applicable. The jury was instructed:

> "Where, under the usual practice of the profession of the defendant, Michelle Klaumann, M.D., different courses of treatment are available which might reasonably be used, the orthopedic surgeon has a right to use her best judgment in the selection of the choice of treatment.
>
> "However, the selection must be consistent with the skill and care which other orthopedic surgeons practicing in the same field of expertise would use in similar circumstances."

The Fosters argue the instruction is misleading because it emphasizes Klaumann's subjective "best judgment" in violation of the objective standard of care applicable to the medical malpractice claims. Under our analytical framework for jury instruction issues, this is a challenge under the second step because the Fosters allege the instruction is legally infirm in that it does not fairly and accurately state the applicable law. See *Plummer*, 295 Kan. at 161. In the alternative, if this court is unwilling to disapprove of the instruction as written, the Fosters contend it was inappropriate under these facts because surgery was the only possible course of treatment. This is a challenge under the third step because the Fosters allege the instruction is not supported by the particular facts of the case at bar. 295 Kan. at 161-62.

In contrast, Klaumann counters that the instruction's language is appropriate because the second paragraph carefully maintains the objective standard of care. She argues the best judgment instruction was required because the treatment options were to have surgery or do nothing surgically and "apply medical management only." And as an alternative, the doctor argues any error with the instruction was harmless and does not require reversal.

The district court issued the best judgment instruction after finding there was testimony on different courses of treatment. It defined those as the expansion of the surgery between March and May and the recommendation whether to use one incision or two. The Court of Appeals reversed, holding the instruction should not be issued in cases like this when the jurors must resolve complex factual issues before determining whether the standard of care was violated. Otherwise, the Court of Appeals said the instruction could mislead jurors to improperly consider the physician's subjective intent or belief. *Foster*, 42 Kan. App. 2d at 663-64.

But almost all medical malpractice cases require jurors to resolve complex factual issues, so this should not be the determinative criterion. We address whether the best judgment instruction fairly and accurately states the law.

PIK Civ. 4th 123.11 derives from a jury instruction this court approved in *Natanson v. Kline*, 186 Kan. 393, 399, 350 P.2d 1093, *reh. denied* 187 Kan. 186, 354 P.2d 670 (1960). *Natanson* is the first Kansas case recognizing a physician's duty to obtain informed consent and to define the parameters of that duty. See *Funke v. Fieldman*, 212 Kan. 524, 530-31, 512 P.2d 539 (1973). In *Natanson*, a breast cancer patient sued the hospital and a physician in charge of the radiology department for injuries sustained during radiation therapy that the patient alleged was administered in an excessive amount. The physician opted to use a newer and harsher procedure involving radioactive cobalt rather than an older method of X-rays. The plaintiff alleged she was not informed about the alternatives or potential consequences from the radioactive cobalt treatment. This court approved the following instruction in dicta:

" 'The law does not require that treatments given by a physician to a patient shall attain nearly perfect results. He is not responsible in damages for lack of success or honest mistakes or errors of judgment unless it be shown that he did not possess that degree of learning and skill ordinarily possessed by radiologists of good standing in his community, or that he was not exercising reasonable and ordinary care in applying such skill and learning to the treatment of the patient. *And if among radiologists more than one method of treatment is recognized, it would not be negligence for the physician to have adopted any of such methods if the method he did adopt was a recognized and approved method in the profes-*

*sion at the time and place of treatment.' "* (Emphasis added.) *Natanson,* 186 Kan. at 399.

The comments to PIK Civ. 4th 123.11 cite *Natanson* as support for issuing the instruction, but there are some notable differences. The instruction approved in *Natanson* instructed the jury that it is not negligence if a physician adopts one recognized and approved method in the profession over another. PIK Civ. 4th 123.11 does not focus the jury on what is (or is not) medical malpractice. Instead, the first paragraph of the PIK Civ. 4th 123.11 instruction informs the jury the physician has a "right" to use his or her best judgment in selecting the choice of treatment. And this language appears to derive from some of this court's other early medical malpractice caselaw defining the physician's contractual duty when the cause of action arose in contract.

At that time, the law stated that a physician did not warrant a cure, unless the doctor entered a special contract for that purpose. But, that caselaw continued to state the doctor's contract of service did imply by law or impliedly warranted the following duties of care:

"that [the doctor] possesses that reasonable degree of learning, skill, and experience which is ordinarily possessed by others of [the doctor's] profession; that [the doctor] will use reasonable and ordinary care and diligence in the treatment of the case which [the doctor] undertakes; and that [the doctor] will use [the doctor's] best judgment in all cases of doubt as to the proper course of treatment." *Teft v. Wilcox,* 6 Kan. 46, 61(1870).

This language filtered through Kansas caselaw after medical malpractice claims began arising in tort. It was simply characterized as the legal duty underlying the negligence claim. See, *e.g., Durflinger v. Artiles,* 234 Kan. 484, Syl. ¶ 3, 673 P.2d 86 (1983); *Goheen v. Graber,* 181 Kan. 107, 112, 309 P.2d 636 (1957); *Paulich v. Nipple,* 104 Kan. 801, 805, 180 P. 771 (1919). More recently, this language was cited again in *Smith v. Welch,* 265 Kan. 868, 881, 967 P.2d 727 (1998).

In *Smith,* the plaintiff was injured during an automobile accident, and she sued the driver. During that litigation, she submitted to a medical exam by the defendant's medical expert. She alleged she was asked personal and inappropriate questions and sexually

battered by the doctor during the exam. She sued the doctor for negligence. In defense, the doctor argued a physician conducting a medical exam for litigation purposes does not have a physician-patient relationship and did not have a duty to avoid negligently injuring the person examined. In defining a normal physician-patient relationship, the *Smith* court held:

"A physician is obligated to his or her patient to use reasonable and ordinary care and diligence in the treatment of cases the physician undertakes, to use his or her best judgment, and to exercise that reasonable degree of learning, skill, and experience which is ordinarily possessed by other physicians. [Citation omitted.]" 265 Kan. at 881.

Klaumann interprets *Smith* as approving PIK Civ. 4th 123.11. And the Court of Appeals cited *Smith* as authority for issuing the best judgment instruction in *Hibbert v. Ransdell*, 29 Kan. App. 2d 328, 334, 26 P.3d 721, *rev. denied* 272 Kan. 1417 (2001). There, the physician discovered an ovarian cyst during an exam and recommended the patient undergo surgery only if an abnormality was discovered by a laparoscopy. The cyst was obscured during the procedure, but the physician found and surgically removed it, later causing incontinence and painful urinary tract infections. Testimony was introduced that the physician should not have immediately recommended surgery but, instead, should have monitored the cyst for 5-6 weeks to see if it resolved itself. If it did not resolve itself, the argument continued, the physician should have tried an oral contraceptive before surgery. The best judgment instruction was issued. The patient argued on appeal the instruction injected a subjective standard for determining negligence in addition to potentially confusing the jury into believing the standard of care turned on whether the doctor tried his best.

The *Hibbert* court concluded the patient's criticism of the best judgment instruction was not "entirely without merit," but it held the instruction was substantially correct and could not have misled the jury. 29 Kan. App. 2d at 334. It characterized the instruction as being not "particularly misleading" because it still instructed the jury that the physician's judgment must be consistent with the skill and care of other specialists. 29 Kan. App. 2d at 332. It also noted that the instruction was based directly on the applicable PIK in-

struction and "our Supreme Court has strongly recommended the use of [PIK] instructions and appears to have accepted the best judgment language as a proper statement of the physician's duties" in *Smith*, 265 Kan. at 881-82. *Hibbert*, 29 Kan. App. 2d at 334.

While this court did approve the best judgment language in *Smith* as a legally correct statement, it was not addressing whether that language was appropriate for a jury instruction. We decline to stretch *Smith* beyond its boundaries. There can be accurate statements of the law that do not help the jury perform its function. To be sure, the instruction at issue in *Natanson* does a better job of focusing the jury on the issue before it—whether the physician committed malpractice—than the language in PIK Civ. 4th 123.11, which states that a physician has a "right" to exercise his or her best judgment when picking a course of treatment.

We strongly encourage future litigants and the PIK-Civil Advisory Committee to reexamine the instruction using this phraseology. But we are not convinced the instruction as a whole misstates the law, principally because the second paragraph directs the jury back to the correct standard of care.

The Fosters cite numerous cases from other jurisdictions declaring those jurisdictions' version of the best judgment instruction improper because such an instruction suggests that the physician's exercise of his or her best judgment precludes a finding of negligence, instead of focusing the determination on whether the physician chose a method approved by the profession. For example, in *Das v. Thani*, 171 N.J. 518, 529, 795 A.2d 876 (2002), the New Jersey Supreme Court criticized the following instruction because it did not make clear to the jury that the " 'selection of an alternative that is objectively unreasonable would violate the doctor's duty of care to the patient.' " The instruction stated in part:

" 'When the accepted standards of medical practice permit two or more courses of action and the physician in the exercise of his judgment selects one of those alternatives, he cannot be found negligent if the course chosen produces a poor result.' " 171 N.J. at 526.

This New Jersey instruction is distinguishable from PIK Civ. 4th 123.11 because, unlike the Kansas instruction, it does not contain

the second paragraph that references the objective standard of care. See also *Parodi v. Washoe Medical Ctr.*, 111 Nev. 365, 370-71, 892 P.2d 588 (1995) (holding that "error-in-judgment" instruction given "may confuse jurors into focusing on the health care provider's subjective intentions and judgments rather than on the real issue of whether the health care provider's conduct conformed to an objective standard of care").

In summary, we hold that PIK Civ. 4th 123.11 does not misstate the law because the second paragraph directs the jury to the objective standard of care, clarifying any potential confusion caused by referencing a physician's right to use the doctor's best judgment. Moreover, the PIK Civ. 4th 123.11, Notes on Use indicate the Duty of Health Care Provider and/or Medical Specialist instructions "must also be given," depending on which standard of care applies. And those instructions were issued here.

Finally, we must determine whether the best judgment instruction was appropriate under the facts in this case. Klaumann's principal argument is that the instruction was required because the treatment options were to have surgery or do nothing surgically and "apply medical management only." The Fosters argue it was error to give the instruction because Keely's injury did not occur as a result of Klaumann choosing one method of surgery over another. They note Keely was injured *during* surgery, citing *Kostel v. Schwartz*, 756 N.W.2d 363 (S.D. 2008).

In *Kostel*, a physician expanded the scope of surgery once it commenced because he found additional pathology requiring treatment during the surgery. The physician requested an " 'error in judgment' " instruction, which stated:

" 'A physician is not necessarily negligent because the physician errs in judgment or because efforts prove unsuccessful. The physician is negligent if the error in judgment or lack of success is due to a failure to perform any of the duties as defined in these instructions.' " 756 N.W.2d at 380.

The South Dakota Supreme Court held this instruction was "only to be given when the physician is presented with multiple treatment options that are viewed as acceptable in the subject field of practice." 756 N.W.2d at 380. And the instruction was inappro-

priate in Kostel's case, the court held, because the issue was whether the physician negligently fused two vertebral segments that did not need to be fused, not whether the physician erred in choosing one of multiple acceptable treatment options. 756 N.W.2d at 381.

Likewise, the Fosters argue Keely's nerve injury occurred because Klaumann negligently performed the surgery, not because the doctor chose one treatment methodology over another. And it is debatable whether choosing not to remove the osteochondromas was a second course of treatment when the situation would never improve under the wait-and-see approach. *Cf. Hibbert*, 29 Kan. App. 2d at 330-34 (one course of treatment was to wait and see whether cyst resolved itself before trying surgery).

Certainly, the Fosters' claims do not present a classic example of alternative courses of treatment like the facts in *Natanson* in which the doctor chose to use radioactive cobalt instead of X-rays and the patient was injured by the cobalt. But we do not need to decide that issue because the Fosters also claim Klaumann did not do enough once she realized Keely's peroneal nerve was damaged. They claim she violated the standard of care by monitoring the nerve damage after surgery, instead of immediately recommending surgery. Klaumann disputed that immediate surgery was an acceptable course of treatment.

We conclude the instruction accurately stated the law and was supported by the case facts. Although neither of the challenged instructions was as helpful to the jury in deciding this case as it could have been with some modification, neither requires a new trial. Therefore, we reverse the judgment of the Court of Appeals reversing and remanding the case for a new trial and affirm the judgment of the district court based on the jury verdict finding Klaumann not at fault.

MORITZ, J., not participating.

JEROME P. HELLMER, District Judge, assigned.