NOT DESIGNATED FOR PUBLICATION

No. 111,899

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROBERT FEIGHT,
*Appellant*,

v.

MOLY MANUFACTURING, INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Cloud District Court; KIM W. CUDNEY, judge. Opinion filed October 9, 2015.
Affirmed.

*William R. Thompson*, of Condray & Thompson, LLC, of Concordia, for appellant.

*Paula J. Wright* and *Dustin J. Denning*, of Clark, Mize & Linville, Chtd., of Salina, for appellee.

Before ATCHESON, P.J., BUSER and GARDNER, JJ.

*Per Curiam*: Robert Feight (Feight) was injured while operating a hydraulic cattle chute purchased from the manufacturer, Moly Manufacturing, Inc. (Moly). Feight filed a lawsuit making strict liability, negligence, and warranty claims against Moly. After a trial, the jury found no liability and rendered a verdict in favor of Moly. Feight appeals, claiming four errors by the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2010, Feight was using a Moly hydraulic chute to facilitate checking cattle for pregnancy. The chute was almost new having been purchased a few weeks earlier. Since the purchase, Feight had used it once or twice without incident.

On the morning of December 29, 2010, Feight again used the chute without incident. He testified that when he first activated the chute after lunch, however, hydraulic fluid suddenly shot out of a control valve and struck him in the cheek, leaving an injection wound. At trial, the parties stipulated that Feight's medical expenses were $423.75.

The operator's manual for the chute warned that using a power source other than a Moly power unit would void the express warranty unless prior written permission was obtained from Moly. Moly power units are designed to provide a constant flow of hydraulic fluid without excess or reverse flow. At the time of his injury, Feight was powering the chute using the hydraulic system of a tractor. At trial, Matt Jundt, a Moly engineer, testified this power source was acceptable provided the tractor provided the "right power" to the chute. Because the tractor had no gauges to determine the flow rate, valves on the tractor were simply adjusted until the chute operated. Testing on the tractor after the accident showed its maximum flow rate was 22 gallons per minute (GPM), while the normal flow rate for the chute's control valve was 12 GPM.

Some facts were disputed at trial. Feight testified that he restarted the tractor after lunch, leaving all the controls as they had been that morning. However, a veterinarian who lunched with Feight, Dr. Matthew Stolzenburg, testified the tractor was running upon their return from lunch, and Feight walked directly to the chute. The doctor could not recall other workers in the area, but he testified that since the tractor was running, "obviously someone . . . was there, but I don't recall seeing them around there." Dr.

Stolzenburg agreed with Feight that the accident occurred when Feight first touched a lever to the control valve.

Feight's uncle, Steve Feight, testified that he disassembled the control valve after the accident. He found a cut o-ring and replaced it. The o-ring was not retained for inspection. After the replacement of the o-ring, the chute operated without a problem, although the control valve started to leak 2 weeks later. Steve Feight said he tightened the bolts around the control valve and the leak stopped.

The cause of the accident was uncertain. Feight's expert witness was John Slocombe, Ph.D., a Kansas State University professor in the Department of Biological and Agricultural Engineering. Dr. Slocombe is not an engineer, does not hold himself out as a hydraulic system expert, and has not published on hydraulic cattle chutes. Of note, Dr. Slocombe did not offer an expert opinion on the cause of the accident, although he did suggest a few modifications to the chute which might have reduced the probability of the accident.

Moly's expert witness was Chad Jarrett, an engineer and the vice president of Brand Hydraulics, a competitor of the company which manufactured the control valve used by Moly. Jarrett thought an o-ring had probably failed, but he did not know the cause of the failure. Jarrett testified that excess flow alone was not the cause because the "pressure lines" to the chute's control valve were fitted with a pressure relief valve. Upon a reverse flow, however, he testified that fluid would enter the control valve from the "tank line," which apparently was not fitted with a relief valve. As a result, "instead of having your lower pressure relief setting, you're at whatever your main system pressure would be."

Jarrett opined that given the design of a tractor, it could easily cause a reverse flow into the chute's control valve. According to Jarrett, generally one uses "the lever on the

3

tractor to raise or lower a plow or a disk . . . so the . . . flow can come either direction out of those ports." He testified that when using the tractor to power the chute, however, "you want to pull the lever so oil only goes in one direction," and "if you were to . . . push or pull the lever the wrong direction, that automatically is going to reverse the flow and turn your tank line into your pressure line." Jarrett said the same result could occur if the hoses between the tractor and the chute were "connected backwards."

Jundt, the Moly engineer, testified he did not know what caused the accident, but he believed "very strongly" that a reverse flow was a possibility. Ray Sturn, a Moly plant manager, agreed that a reverse flow may have caused the accident.

With regard to damages, Feight sought compensation for his past medical expenses of $423, and for the cost of plastic surgery to reduce the scar on his cheek, estimated at $10,000. Feight also sought compensation for disfigurement in the amount of $125,000, and for pain and suffering in the amount of $125,000.

In closing argument, Feight's counsel contended the cause of the accident, or at least the "cause of the defect," was immaterial:

> "No one knows what the actual cause of the defect is. I don't know. The experts don't know. It doesn't matter. All the jury needs to find is that there was a defect.
> "You don't have to worry about the cause. Why was . . . there so much testimony about causes? It was an attempt to show that somebody else was at fault for the injury, someone else was responsible for the eruption of hydraulic fluid."

In response, Moly's counsel countered that the most likely cause of the accident was that someone started the tractor before Feight returned from lunch, and, in the process, pushed the lever controlling the hydraulic flow in the wrong direction which reversed the flow of the hydraulic fluid. This caused the chute to send a powerful spray into Feight's cheek.

The jury rendered a defense verdict in favor of Moly. Feight filed a timely appeal.

JURY INSTRUCTION ON STRICT LIABILITY

As part of his lawsuit, Feight brought a strict liability claim "for defective design, defective manufacture, failure to warn and/or instruct, failure to inspect and/or test." Feight submitted a proposed instruction, based on PIK Civ. 4th 128.17, which stated in part: "A product is in a defective condition if [it] has defects in design, manufacturing, instructions, warnings, and such defects existed at the time the product left the manufacturer's and/or seller's hands." Feight added to this language (derived from the PIK instruction) the following quotation taken from *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 632, 886 P.2d 869 (1994) (quoting *Lenherr v. NRM Corp.*, 504 F. Supp. 165, 172 [D. Kan. 1980]):

> "'A product may also be defective without any ascertainable defect in the product and although the product was precisely what it was intended to be, if the manufacturer fails to give adequate and timely warnings as to the dangers or hazards which may result from a foreseeable use or misuse of the product.'"

Feight then argued for this additional language at the instructions conference.

The district judge rejected the proposed additional language, stating: "I'm going to stick with [the] PIK instruction." The district court then gave Feight's proposed version (without the additional language) informing the jury in Instruction No. 18: "A product is in a defective condition if [it] has defects in design, manufacturing, instructions, warnings, and such defects existed at the time the product left the manufacturer's and/or seller's hands."

On appeal, Feight does not complain of the typographical or grammatical errors in Instruction No. 18. As a result, and also because the district court followed Feight's

5

proposed instruction, he has waived any such issues on appeal. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011); *State v. Bailey*, 292 Kan. 449, 459, 255 P.3d 19 (2011). Instead, Feight renews his argument for the additional language from *Jenkins*, and claims that we should evaluate this instructional issue using a clearly erroneous standard of review.

Our Supreme Court has provided us with the proper analytical approach to use in considering instructional issues: "When analyzing jury instruction issues, we (1) determine whether the issue can be reviewed, (2) determine whether any error occurred, and (3) finally determine whether the error requires reversal." *Siruta v. Siruta*, 301 Kan. 757, 771, 348 P.3d 549 (2015).

The first step considers "'reviewability of the issue from both jurisdiction and preservation viewpoints'" under an unlimited standard of review. *Foster v. Klaumann*, 296 Kan. 295, 301, 294 P.3d 223 (2013). Neither party challenges jurisdiction, and Feight contemporaneously requested the additional language to the elements instruction which undoubtedly preserved the issue, so, contrary to his assertion, review is not for clear error. See *Siruta*, 301 Kan. at 772; *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013).

The important issue on appeal is the second step—whether the instruction was erroneous. When deciding whether the instruction was legally erroneous, this court exercises unlimited review. See *Klaumann*, 296 Kan. at 301. Of note, neither party argues the instruction was factually erroneous, *i.e.*, that the evidence was insufficient to support the additional language, so that part of step two is not in question. See *Siruta*, 301 Kan. at 775.

Feight acknowledges the PIK-based instruction given by the district court "explains . . . a product can be defective in its warnings." Feight maintains, however, the

6

PIK-based instruction "fails to address a complete failure to give a warning or the need for a warning in a situation of foreseeable misuse of the product." According to Feight: "As Moly did not warn chute users of reverse flow potential, of hazards caused by mishandling of tractor controls, or of the danger in using a tractor to power the chute, there was a real possibility that a modified instruction may have produced a different verdict."

Instruction No. 18 provided the jury with the elements for Feight's strict liability claim. It generally listed the various ways a product could be defective without specifically explaining or emphasizing any particular kind of defect. At the outset, this instruction was, in essence, a recitation of PIK Civ. 4th 128.17. Although the use of PIK instructions is not required, it is strongly recommended, as these "'instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions.' [Citation omitted.]" *State v. Acevedo*, 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013).

In addition to emphasizing the propriety of Instruction No. 18 (given that it is a mirror-image of PIK Civ. 4th 128.17), Moly points to Kansas Supreme Court cases which have held jury instructions should be general and should neither single out particular theories nor make arguments for counsel. See *Timsah v. General Motors Corp.*, 225 Kan. 305, 315, 591 P.2d 154 (1979); *Bechard v. Concrete Mix & Construction Inc.*, 218 Kan. 597, 600-01, 545 P.2d 334 (1976); see also *Ettus v. Orkin Exterminating Co.*, 233 Kan. 555, 563, 665 P.2d 730 (1983) (calling *Bechard* "an excellent discussion of the general principles to be applied in determining whether or not instructions of the court are in error"). Based on this precedent, we can find no error in the district court's refusal to emphasize only one of the strict liability grounds—absence of warnings—that Feight alleged in his pleadings.

Warnings were also discussed in Instruction No. 14, which dealt with Feight's negligence claim:

> "A manufacturer and/or seller of a product which it knows, or by the exercise of ordinary care should know, is potentially dangerous to users thereof, has a duty to give adequate warnings of such danger where injury to a user thereof can be reasonably anticipated if an adequate warning is not given. The duty to warn includes a duty to provide a warning to dangers inherent in use and the duty to provide adequate instructions for safe use."

Instruction No. 14 generally covered the ground Feight suggested in his proposed addition to Instruction No. 18. Although Instruction No. 14 was not a strict liability instruction, it dealt with product warnings as did Instruction No. 18, and an appellate court considers jury instructions as a whole without isolating any one instruction. *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014). Especially in the context of the totality of instructions, the jury was adequately informed regarding warnings. Any further elaboration upon Moly's alleged failures to warn were a matter for closing argument, not instructions from the district court. We are persuaded that Instruction No. 18, in concert with the other jury instructions provided to the jury, was legally appropriate, and the district court did not err in declining to instruct the jury regarding the additional language requested by Feight.

Next, assuming for purposes of a complete analysis that the district court did err, we consider whether any error was harmless under the third step of the *Siruta* test. That step predicates a finding of harmlessness on a determination that there is no reasonable probability that the error affected the outcome of the trial in light of the entire record. See K.S.A. 2014 Supp. 60-261; *Siruta*, 301 Kan. at 771; *Klaumann*, 296 Kan. at 301-02; *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

In closing arguments, Feight's counsel's discussion of product warnings was limited in scope. He criticized Moly's written warnings, remarking for example about a warning in the operator's manual to stay clear of high pressure hydraulic leaks: "Well, what on earth does that do to you when the hydraulic leak . . . shoots into your face from two or three feet away? That's not a serious safety warning."

Yet, Feight's counsel failed to identify any warnings Moly improperly omitted from the operator's manual. And Feight admitted on cross-examination that he did not even read the operator's manual before operating the chute. Given this factual scenario, it is unclear how additional written warnings could have prevented the accident.

On the other hand, Moly's counsel presented evidence showing Moly had met industry standards for warnings. For example, Jarrett testified about a recent trip to the World Ag Exposition in Tulare, California, where he saw no chutes with affixed warnings beyond those already used by Moly. Jarrett testified that no manufacturer could warn about every conceivable risk and that Feight's accident was "[v]ery rare."

Feight's counsel did argue in closing argument about the power sources Moly allowed purchasers to use to activate the chute: "Now, I don't know why they don't require the people to buy their own gas engines and electric motors, but if they're not going to do that, they should at least tell the buyers, 'Look, there might be a problem, here's what you can do about it.' Moly decided not to do [that]."

The record shows, however, that Steve Feight, who purchased the chute, discussed the power source with Sturn, and that Sturn advised him of the need to match the power source to the chute. In addition, the operator's manual warned that the express warranty was voided by use of a non-Moly power source without prior written permission from Moly. Steve Feight explained that he decided not to use a Moly power source because it

9

was "a couple thousand dollar option," and "we either have tractors that we're feeding with that day or we've got bale bed pickups in the pastures."

Feight maintains Moly should have done more, but the argument seems to presume the cause of the accident was a reverse flow. It is unclear how additional warnings in this regard to Steve Feight would have prevented the accident. Steve Feight did not testify that he would have instructed Feight about the possibility of a reverse flow if Moly had warned him of the danger. Feight testified that his uncle did not give him any instructions regarding the valve settings on the tractor. Importantly, Feight, for his part, did not testify he was ignorant of the reverse flow danger, or that if his uncle had warned him, he would have behaved differently on the day of the accident.

Indeed, Feight testified to facts which would exclude a reverse flow, saying he started the tractor after lunch with the controls still in place from a successful morning's operation. If true, then a reverse flow should not have occurred and the warnings regarding a reverse flow would have been irrelevant to the cause of Feight's injury. Assuming the district court's failure to instruct the jury in keeping with Feight's proposed additional language in Instruction No. 18 was error, we are convinced there is no reasonable probability the additional language would have affected the outcome of the trial. For all of these reasons we find no reversible instructional error.

THE VERDICT FORM

Next, Feight maintains that in light of his strict liability claim, the liability question on the verdict form should not have used the word "fault." Moly responds that this court need not review the issue since Feight invited any error.

The standards of review for jury instructions also apply to verdict forms. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 387-88, 266 P.3d 516 (2011). "If . . . a

10

party fails to preserve an objection to the jury instructions by not raising the argument before the district court, we will still review whether the instruction was legally and factually appropriate but will reverse only for 'clear error.'" *Siruta*, 301 Kan. at 772. However, "[w]hen [a party's] requested instruction is given to the jury, the [party] cannot complain the requested instruction was error on appeal." *Bailey*, 292 Kan. at 459.

Feight not only failed to object to the verdict form, he proposed the use of "fault" on the verdict form. The district court then provided the jury with Feight's requested verdict form. As a consequence, Feight has invited any error and may not now complain that the verdict form was erroneous.

Moreover, even if the verdict form was erroneous, any error was harmless. Feight also submitted a proposed instruction explaining his various claims (including strict liability) and this instruction used the word "fault." Feight's proposed instruction provided: "The plaintiff claims: That he was injured due to the defendant's fault in the following respects." In this proposed instruction Feight summarized his strict liability, negligence, and implied warranty claims. The district court simply followed Feight's proposed instructions in both respects.

Given this instruction, the jury necessarily would have understood "fault" on the verdict form to mean liability under any of Feight's claims. There was, after all, only one question on liability, and the jury was further instructed: "It is not necessary that each of you agree upon a specific claim." We are not persuaded the verdict form would have caused the jury to apply the technical legal meaning of "fault" derived from tort law to thus exclude a possible verdict in Feight's favor based on his strict liability claim. In short, Feight has failed to show a reasonable probability that the use of the term "fault" in the verdict form affected the outcome of the trial.

11

Feight contends the jury's verdict for Moly was contrary to the evidence. Our standard of review provides:

> "When a verdict is challenged as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the appellate court should not intervene." *Unruh v. Purina Mills*, 289 Kan. 1185, Syl. ¶ 7, 221 P.3d 1130 (2009).

Feight argues that "Moly went to great lengths to speculate that the Feights misused the cattle chute. But, no evidence was presented showing that such misuse actually occurred." Preliminarily, we question Feight's use of the word "misuse." There was evidence the accident could have been caused by a reverse flow, and there was evidence suggesting how the reverse flow could have occurred. As a result, the jury could have concluded that a reverse flow had in fact occurred, but it was not shown that anyone was at fault.

Feight argues in this respect: "No warnings were made concerning the possibility of hydraulic eruption if a reverse flow was created by a mishandling of tractor valve controls." The evidence and possible inferences regarding warnings have previously been discussed. Moly presented evidence that it advised Steve Feight to match the power source to the chute. Feight, in turn, presented no evidence he was ignorant of such a requirement or, if Moly had warned his uncle further, he would have behaved differently. Considering the evidence in the light most favorable to Moly, there was evidence that Moly's product warnings were adequate, and that Feight would have been injured even if additional warnings had been provided.

Feight also claims the evidence showed "an almost new product malfunctioned in a way that made it dangerous to the user. The product was not fit to handle livestock as was its purpose." This argument, like many of Feight's arguments, focuses on the chute. But based on substantial evidence, the jury could have concluded the problem was actually the power source. If so, the trial's outcome hinged on Moly's responsibility for the power source. Moly offered its own power source, but Steve Feight chose not to buy it. Having made that choice with a warning from Moly to match the power source to the chute, the jury could have concluded Moly was not liable under any of Feight's theories.

We conclude the verdict was not contrary to the evidence.

ASSESSMENT OF COSTS

The district court assessed costs against Feight "in accordance with K.S.A. 60-2002 and 60-2003." Feight argued below and reprises the argument on appeal that the district court should not have assessed costs because Moly did not file a motion for costs.

It is settled law that "[t]he assessment of costs . . . is within the discretion of the [district] court, and its determination will not be disturbed on appeal without a showing of an abuse of discretion." *In re Marriage of Ormsbee*, 39 Kan. App. 2d 715, 719, 186 P.3d 806 (2008). Discretion is abused when the district court acts arbitrarily, fancifully, or unreasonably, or when it acts based on an error of law or fact. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

Feight contends the district court acted based on an error of law, and he also states the district court "ignored its own order requiring post trial motions to be filed within 10 days of the close of trial." But under K.S.A. 2014 Supp. 60-2002(a), "the costs shall be allowed to the party in whose favor judgment is rendered." Neither this statute, nor

13

K.S.A. 2014 Supp. 60-2003 and Supreme Court Rule 187 (2014 Kan. Ct. R. Annot. 295), the other provisions cited by Feight, require a motion for assessment of costs by the prevailing party. As a result, the district court's instruction at the end of trial, to file any "post trial motions . . . within the next ten days," did not apply to costs. The district court did not abuse its discretion.

Affirmed.