IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,105

DOUGLAS L. CASTLEBERRY, Individually and as the Administrator of the ESTATE OF
BARBARA MAE CASTLEBERRY, Deceased, and on behalf of SUSAN M. KRAFT and SCOTT
CASTLEBERRY, Adult Heirs at Law of BARBARA MAE CASTLEBERRY, Deceased,
*Appellees*,

v.

BRIAN L. DEBROT, M.D.,
*Appellant.*

SYLLABUS BY THE COURT

1.

In a civil case, when the Kansas Supreme Court grants a petition for review of a
Court of Appeals' decision, only those issues presented in the petition, or fairly included
therein, will be considered.

2.

Proximate cause is the cause that in a natural and continuous sequence, unbroken
by any superseding cause, both produced the injury and was necessary for the injury. The
injury must be the natural and probable consequence of the wrongful act. Individuals are
not responsible for all possible consequences arising from their negligence—just those
that are probable according to ordinary and usual experience.

3.

Any perceived distinction between the phrases "causing an event" and
"contributing to an event" is a distinction without a difference.

1

4.

Remarks of counsel in a civil case result in reversible error when the prejudiced party has not had a fair trial. Reversal is appropriate when there is a reasonable probability the error affected the trial's outcome in light of the entire record.

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 22, 2016. Appeal from Sedgwick District Court; RICHARD T. BALLINGER, judge. Opinion filed August 24, 2018. Judgment of the Court of Appeals affirming the district court is affirmed on the issues subject to review. Judgment of the district court is affirmed on the issues subject to review.

*Steven C. Day*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, argued the cause, and *Christopher S. Cole*, of the same firm, was with him on the briefs for appellant.

*Jonathan Sternberg*, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, argued the cause, and *Larry Wall* and *Tina Huntington*, of Wall Huntington Trial Law, of Wichita, were with him on the briefs for appellees.

The opinion of the court was delivered by

BILES, J.: Brian L. DeBrot, M.D., appeals after a jury found him negligent and awarded damages to his deceased patient's heirs and estate. The medical malpractice theory was that DeBrot failed to recognize the patient was about to suffer a stroke the day before she had it. A Court of Appeals panel affirmed. See *Castleberry v. DeBrot*, No. 111,105, 2016 WL 1614018, at *30 (Kan. App. 2016) (unpublished opinion). We granted review and now affirm on the issues subject to our review, although our rationale differs in some respects.

At the outset, we must resolve a challenge about what issues DeBrot's petition for review identifies. We hold those questions are: (1) whether it was error to instruct the jury that a party is at fault when the party's "negligence caused or contributed to the event

2

which brought about the claims for damages"; (2) whether plaintiffs' counsel's closing arguments contained improper remarks and, if so, whether that requires reversal; and (3) whether expert standard-of-care testimony that doctors must "err on the safe side" was improper and, if so, whether that requires reversal.

As to the instructions, we adhere to our holding in *Burnette v. Eubanks*, 308 Kan. ___, Syl. ¶ 3, ___ P.3d ___ (this day decided) ("Any perceived distinction between the phrases 'causing an event' and 'contributing to an event' is a distinction without a difference."). We also hold that plaintiffs' counsel improperly urged the jury to decide the case on concerns other than the law and the evidence. But we determine there is no reasonable probability the verdict would have been different without this error. Finally, we hold the district court did not abuse its discretion by permitting experts to testify as they did because they simply explained the mental processes used in forming their opinions about whether DeBrot breached the standard of care. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Barbara Castleberry suffered a debilitating stroke on December 20, 2007. About a year later, she fell and sustained a fatal head injury. This lawsuit claims a direct causal connection between these two events and DeBrot's medical malpractice.

Barbara saw DeBrot, a primary care physician, five times before her 2007 stroke, including December 6 and December 19. During the first December visit, Barbara's "chief complaint" was left hand numbness. She reported tingling in the hand, increasing difficulty picking things up, difficulty turning pages, dizziness, and foot numbness. She wondered if she was having a stroke. DeBrot believed these symptoms were caused by carpal tunnel syndrome. He testified a stroke "[w]asn't even a consideration" because he

3

clinically reproduced her symptoms, which would have been impossible if she had suffered a stroke.

DeBrot referred Barbara to a carpal tunnel specialist, who confirmed the diagnosis and began treatment. She returned to DeBrot on December 19—the day before her stroke—chiefly complaining about wrist pain. She had high blood pressure and reported dizziness, constipation, increased numbness, blurred vision, and emotional problems. DeBrot believed a steroid injection given by the specialist two days earlier caused the pain. DeBrot rescheduled her follow up with the specialist for an earlier date.

After Barbara died, her husband and estate sued DeBrot for damages sustained during her remaining lifetime after the stroke and for damages resulting from Barbara's death. The negligence focused on DeBrot's alleged failure to recognize the impending stroke or to diagnose Barbara with transient ischemic attacks (TIA) during the two December 2007 visits.

Barbara suffered an ischemic stroke, which occurs when a blood vessel becomes blocked, depriving necessary blood supply to an area in the brain. This is different from a hemorrhagic stroke, in which a blood vessel ruptures, placing pressure on the surrounding brain cells. A TIA, like an ischemic stroke, blocks blood flow to one or more areas in the brain; but unlike a stroke, the blockage is temporary. A TIA is a warning sign for an impending stroke. Plaintiffs claimed the stroke was avoidable had DeBrot acted within the standard of care during Barbara's December visits because (1) he would have discovered the blockage in Barbara's carotid artery by listening to the artery or ordering an ultrasound or Doppler examination; or (2) he would have placed Barbara on aspirin therapy, which reduces the ischemic stroke risk.

4

A jury found DeBrot at fault and awarded Barbara's estate, her husband, and children economic and noneconomic damages. The district court entered judgment against DeBrot for damages totaling $907,484.69. DeBrot appealed.

Before the Court of Appeals, DeBrot argued for reversal claiming: (1) the district court did not properly instruct the jury on causation and the evidence required to prove it; (2) the court instructed the jury it could not assign fault to plaintiffs; (3) plaintiffs' counsel made prejudicial remarks during closing arguments; (4) the court permitted plaintiffs' experts to redefine the duty of care owed to Barbara; and (5) the court erred in making various evidentiary rulings. The panel affirmed. *Castleberry*, 2016 WL 1614018, at *30.

DeBrot filed a petition for review with this court, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ISSUES NOT PROPERLY BEFORE THIS COURT

We begin by defining the issues because DeBrot's supplemental brief, filed after this court granted review, argued questions not itemized as being erroneously decided by the Court of Appeals. Plaintiffs objected to this. Our rule states:

> "An order granting review may limit the issues on review. If review is not limited, the issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition *allege were decided erroneously by the Court of Appeals*. In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties have preserved for review." (Emphasis added.) Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 56).

5

The rules also explain how petitions for review are to be drafted. Rule 8.03(a)(4) states:

"The petition must contain concise statements of the following, in the order indicated:

. . . .

"(C) *A statement of the issues decided by the Court of Appeals of which review is sought. The court will not consider issues not presented or fairly included in the petition. The court, however, may address a plain error not presented.* In a civil case, the petitioner also must list, separately and without argument, additional issues decided by the district court which were presented to, but not decided by, the Court of Appeals, which the petitioner wishes to have determined if review is granted." (Emphasis added.) Supreme Court Rule 8.03(a)(4) (2018 Kan. S. Ct. R. 54).

In DeBrot's petition for review, he stated in his "Statement of Issues For Which Review Is Sought" as follows:

"*Although Dr. DeBrot believes all of the issues raised in this appeal should be considered*, the following particularly merit review:

"1.     Whether the PIK recommended instructions on causation are fundamentally flawed, in that they do not correctly state the law of proximate cause?

"2.     Whether the Court of Appeals erred by failing to address the prejudicial impact of plaintiffs' improper 'Reptile Litigation' arguments in light of the overall theme of plaintiffs' case and applied the wrong legal standard?

"3.     Whether the Court of Appeals incorrectly upheld the trial court in allowing expert witnesses to redefine the legal duty of a physician?" (Emphasis added.)

6

After review was granted, DeBrot included a section in his supplemental brief entitled, "The Court of Appeals Erred in Rejecting Defendant's Contentions as to Several Evidentiary Issues." Similarly, DeBrot argued in his supplemental brief that the panel erred in rejecting his argument that the district court should have instructed the jury that its causation findings had to be based on expert testimony. DeBrot never explained why he included these issues in his supplemental brief nor did he explain their earlier omission from his petition for review or his reply in support of that petition for review.

When asked at oral argument about these omissions, DeBrot's counsel conceded the additional issues were not raised in the petition for review but hoped the introductory phrase—"Dr. DeBrot believes all of the issues raised in this appeal should be considered"—was sufficient to overcome plaintiffs' objection.

"A party aggrieved by a decision of the Court of Appeals on a particular issue must seek review in order to preserve the matter for Kansas Supreme Court review." *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 172, 298 P.3d 1120 (2013). We hold that DeBrot failed to preserve the arguments regarding the evidentiary issues, the question regarding limiting causation evidence to experts, and the instruction that plaintiffs were not at fault. See *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 920, 399 P.3d 148 (2017) (quoting Supreme Court Rule 8.03[h][1], which states "'[t]he issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals" to limit the issues to be addressed); *Chism v. Protective Life Ins. Co.*, 290 Kan. 645, Syl. ¶ 1, 234 P.3d 780 (2010) ("In a civil case, when the Kansas Supreme Court grants a petition requesting review of a Court of Appeals' decision . . . only issues presented in the petition, or fairly included therein, will be considered.").

We note Rule 8.03(h)(1) recites, in part, "In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties have preserved for review." This discretion ties to Rule 8.03(a)(4)(C), which requires parties to identify and separately list any issues presented to—but not decided by—the Court of Appeals that the party believes the Supreme Court should consider in its review. Rule 8.03(h)(1) is not a stealth mechanism to excuse the specificity required by Rule 8.03(a)(4) and our other rules controlling the review process. Similarly, we do not consider DeBrot's introductory phrase quoted above as sufficient to be considered "fairly included" in the petition.

To view this otherwise would do a disservice to the other parties who must decide whether to oppose review. They should not have to guess about this. See Rule 8.03(c) (granting a party opposing a petition or cross-petition right to file a response). In the same vein, uncertainty about the issues in controversy overly complicates this court's decision-making process when determining whether to grant review or grant review only on limited issues.

We hold the questions subject to review are those itemized in DeBrot's petition for review:  (1) whether it was error to instruct the jury that a party is at fault when the party's "negligence caused or contributed to the event which brought about the claims for damages"; (2) whether plaintiffs' counsel's closing arguments contained improper remarks and, if so, whether that requires reversal; and (3) whether expert standard-of-care testimony that, e.g., doctors must "err on the safe side" was improper and, if so, whether that requires reversal.

8

DeBrot argues the judgment must be reversed because the district court did not properly instruct the jury on causation. He contends the instructions permitted the jury to impose liability without finding Barbara's injuries would not have occurred "but-for" his negligence. We disagree.

*Additional Facts*

Two doctors testified as plaintiffs' experts: William Miser and Frank Yatsu. We must detail their testimony.

Miser concluded DeBrot departed from the standard of care by failing to consider TIA or stroke; failing to listen to Barbara's carotid artery for blockage; failing to recheck her abnormally high blood pressure at the December 19 visit; failing to comply with standards on hypertension treatment by using only one medication to treat her; failing to place her on aspirin; failing to do additional clinical tests that would have contradicted carpal tunnel as the sole explanation for her symptoms; and failing to explore or document the blurred vision and other symptoms she reported. He did not dispute DeBrot's carpal tunnel diagnosis but concluded it inadequately explained the symptoms.

Miser believed the sudden numbness, particularly on the left side, was a neurological symptom that should have led DeBrot to address the stroke possibility. Miser said the negative changes between the two December visits—during which carpal tunnel treatment began—"scream[ed] out that something [was] going on." He noted Barbara's blurred vision and dizziness could have been caused by "showers of clots" during a TIA. He concluded DeBrot should have investigated and ruled out psychological

9

problems Barbara reported, even if they were not stroke related. Miser determined DeBrot's "judgments [were] below the safe practice of medicine, standard of care."

Miser also testified DeBrot's failure to adequately treat Barbara's hypertension, to begin aspirin therapy, and to test for a carotid artery blockage all led to DeBrot's failure to recognize an impending stroke. Miser "absolutely believe[d]" aspirin "would have reduced and probably prevented, more probably right than wrong, [Barbara's] stroke, disabilities, and death." Miser said DeBrot's shortcomings caused Barbara's injuries because the carotid artery stenosis could have been addressed with a procedure that restores blood flow through a blocked artery; and, if done soon enough after the blockage's onset, can reverse its symptoms. When performed, the operation averts a stroke by timely restoring blood flow. Miser explained other reasons for the stroke were DeBrot's failure to follow up on Barbara's psychological changes and his failure to seek medical attention for the neurological symptoms. He said DeBrot's mismanagement of Barbara's blood pressure "was an important part of the reason she had a stroke, disabilities, and death."

Yatsu died before trial but his deposition was read. Yatsu disagreed with DeBrot's conclusion that Barbara had carpal tunnel syndrome. He believed DeBrot departed from the standard of care by failing to diagnose the TIA. In particular, he cited DeBrot's failure to adequately address her reported dizziness, blurred vision, and psychological symptoms, as well as her hypertension and dyslipidemia, which Yatsu said are known to provoke artery obstruction. Yatsu said it would have taken just a few seconds to listen to Barbara's carotid artery, but he could not say to a reasonable degree of certainty whether DeBrot would have heard a "bruit," indicating artery obstruction. Yatsu said a carotid duplex ultrasound would have revealed a stenosis. Yatsu said DeBrot should have ordered this test on December 6 based on Barbara's hand numbness and tingling,

10

dizziness, hypertension, and hyperlipidemia. Similarly, Yatsu believed DeBrot should have diagnosed Barbara's TIA on December 19.

Yatsu noted there is a surgical procedure to address stenosis that has a 65-75% chance of success. He said if DeBrot had discovered Barbara's stenosis and had Barbara undergone that surgery, it was more probable than not Barbara would have avoided the stroke. Yatsu said there was time for the surgery before the December 20 stroke. He believed if Barbara's TIA was treated on either visit, the stroke more probably than not could have been avoided. Yatsu testified Barbara's illnesses after the stroke were caused by the stroke.

DeBrot's experts, Doctors Alexander Davis and Jeffrey Kaplan, testified DeBrot acted within the standard of care. Hinting at causation, Davis said blood pressure treatment to avoid strokes would occur over years and suggested a patient would not have a stroke "next month" if treatment was not altered in the next four visits. And he said blood pressure only directly causes hemorrhagic strokes, which was not the type Barbara had. Kaplan's testimony did not address causation.

*Jury Instructions*

The district court gave the following relevant instructions:

"Instruction No. 7

"*A physician has a duty to use the learning and skill ordinarily used by other members of that same field of medicine in the same or similar circumstances*. In using this learning and skill, the physician must also use ordinary care and diligence. A violation of this duty is negligence."

11

"Instruction No. 8

"In determining whether a primary care physician used the learning, skill, and conduct required, you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge. *On questions of medical or scientific nature concerning the standard of care of a primary care physician, only those qualified as experts are permitted to testify*. The standard of care is established by members of the same profession in the same or similar circumstances. It follows, therefore, that the only way you may properly find that standard is through evidence presented by expert witness."

"Instruction No. 12

"Negligence is defined in Instruction No. 7.

"A party is at fault when he is negligent and that negligence *caused or contributed to* the event which brought about the claims for damages." (Emphases added.)

In addition, Instruction No. 11 advised jurors: "[DeBrot] further denies that any act or omission on his part was *the cause* of any of plaintiffs' claimed damages or injuries." (Emphasis added.) Instruction No. 14 informed: "If you find Doug Castleberry is entitled to recover damages, you should allow the amount of money which will reasonably compensate him *for the loss caused by defendant*." (Emphasis added.) And Instruction No. 15 advised: "If you find Susan Kraft or Scott Castleberry are entitled to recover damages, you should allow the amount of money which will reasonably compensate them *for the loss caused by the defendant*." (Emphasis added.)

DeBrot requested four modifications to the instructions to address his causation concerns. First, he proposed an alternative instruction describing the ways plaintiffs claimed damages because of his fault. Second, he requested an instruction that "the

12

plaintiff in a medical malpractice case bears the burden of showing not only the defendant's negligence, *but that the negligence caused the plaintiff's injury*." (Emphasis added.) Third, he requested an instruction that "the proximate cause of an injury is that cause which in natural and continuous sequence produces the injury and without which the injury would not have occurred," and that

> "[c]onduct is the proximate cause of an injury if the conduct is a substantial factor in bringing about the harm. Conduct is a substantial factor if it has such an effect in producing the harm as to lead a reasonable person to regard it as a cause of the harm so that the conduct in question may properly be regarded as being responsible for the injury."

Fourth, DeBrot requested a comparative fault instruction, which defined "fault" as negligence that "caused or contributed to the event which brought about the claims for damages." But unlike the instructions given, DeBrot's would have directed the jury to (1) determine if any party is at fault; (2) assign percentages of fault to each person found to be at fault; and (3) assign a total of 100% fault among those individuals. They would have had the jury consider comparative fault between him, Barbara, and plaintiffs and assign appropriate percentages of fault to each.

DeBrot also objected that the combination of Instruction No. 12's "contributed to" language and the absence of a proximate cause definition would imply that any small contribution might be adequate to find fault.

*Court of Appeals Rulings*

The panel held the district court erred by using the "caused or contributed to" language in Instruction No. 12. It noted this phrasing was adapted from PIK Civ. 4th 105.01, which discusses comparative fault. The panel determined Instruction No. 12's use

13

of this phrase was legally inappropriate because comparative fault was inapplicable to the current case. *Castleberry*, 2016 WL 1614018, at *8.

Even so, the panel concluded this error was harmless because there was no reasonable probability it affected the trial's outcome. 2016 WL 1614018, at *9. It explained the "central issue" was whether DeBrot's negligence caused Barbara's injury. It further noted plaintiffs' experts testified DeBrot's failure to diagnose stroke led to Barbara's injury and death, while defendant's experts testified DeBrot did not deviate from the standard of care. The panel concluded:

> "Simply put, the question presented to the jury was whether the defendant caused Barbara's injury. There was no other source presented that could have contributed to her injury. As a result, the defendant has failed to show a reasonable probability that the definition of causation given in [the instruction] affected the outcome of the trial." 2016 WL 1614018, at *9.

The panel rejected DeBrot's claim that the court should have instructed the jury on proximate cause. It noted the PIK Committee specifically recommends no instruction defining causation. Given that, the panel concluded the district court did not err in refusing to give DeBrot's requested proximate cause instructions. 2016 WL 1614018, at *9.

*Standard of Review*

> "'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to

14

the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011) . . . .' [Citation omitted.]" *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

*Discussion*

Because DeBrot objected to the causation instructions and requested alternatives that he now argues should have been given, he preserved these claims for appeal. See *Foster*, 296 Kan. at 302 (holding medical malpractice litigant preserved instructional error issue by objecting to instructions at trial); *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011) (noting failure to raise issue before trial court would preclude litigant from raising it before appellate court).

To be legally appropriate, "'an instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm.'" *State v. McDaniel*, 306 Kan. 595, 615, 395 P.3d 429 (2017) (quoting *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012]). "If an instruction is legally appropriate and factually supported, a district court errs in refusing to grant a party's request to give the instruction." *Plummer*, 295 Kan. at 162.

"To establish medical malpractice, a plaintiff must show:  (1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 15, 289 P.3d 1098 (2012)." *Foster*, 296 Kan. at 302.

15

Our caselaw defines proximate cause as

"the cause that in a natural and continuous sequence, unbroken by any superseding cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act. *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). Individuals are not responsible for all *possible* consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience." *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008).

Proximate cause is ordinarily a factual question to be resolved by the trier of fact. *Cullip v. Domann*, 266 Kan. 550, 556, 972 P.2d 776 (1999). But see *Hale*, 287 Kan. at 324 (noting when "all the evidence on which a party relies is undisputed and susceptible of only one inference, the question of proximate cause becomes a question of law").

"There are two components of proximate cause: causation in fact and legal causation. To establish causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred. To prove legal causation, the plaintiff must show it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable." *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015).

DeBrot argues the phrase "or contributed to" in the given instruction permitted the jury to impose liability on him without finding causation in fact, because "[n]othing in the ordinary meaning of the word contributed suggests the existence of the legally critical 'but for' requirement." In other words, he asserts the instruction was not legally appropriate.

16

The panel took a different tack but agreed the instruction was legally inappropriate. The panel held the error arose because this was not a comparative fault case. From the panel's perspective, the district court used a definition from a pattern instruction involving a theory of liability inapplicable to the case. *Castleberry*, 2016 WL 1614018, at *8-9.

This holding comes to us on review unchallenged by plaintiffs since they did not cross-petition for review. See *Snider*, 297 Kan. at 172 (challenge to Court of Appeals' holding not before Supreme Court on review when issue not raised in petition or cross-petition). Ordinarily, that would settle the matter. See *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1121, 307 P.3d 1255 (2013) (litigant's failure to cross appeal for review of claim precluded its consideration). But in this instance, we cannot accept this conclusion because our logic in rejecting DeBrot's contentions so necessarily undercuts the panel's rationale that we end up concluding there was no error in the district court's instruction. See *Burnette*, 308 Kan. ___, Syl. ¶ 3 ("Any perceived distinction between the phrases 'causing an event' and 'contributing to an event' is a distinction without a difference.").

In *Burnette*, we considered causation instructions substantially similar to those given in the current case. We concluded they were legally and factually appropriate, and rejected defense arguments substantially similar to those DeBrot raises. We held the instructions correctly communicated the cause-in-fact requirement under Kansas law. *Burnette*, slip op. at 19 ("[T]he instructions told the jury that to impose liability for [the decedent's] suicide on either defendant, it would have to find defendant's negligence was a but-for cause of his death."). We also concluded:

"The 'caused or contributed to' language in Instruction No. 11 permitted the jury to assign fault only if a defendant's negligence 'ha[d] a share in' producing the injury.

17

[*Lollis v. Superior Sales Co., Inc.*, 224 Kan. 251, 263, 580 P.2d 423 (1978)]. If the jury believed the injury would have occurred without a defendant's negligence, i.e., the negligence did not have a share in producing the injury, the instructions told the jury to assign no fault to that defendant." *Burnette*, slip op. at 20.

We could make these same points here when addressing whether the error the panel found was harmless. But in the end, since we would logically circle back to the real point, i.e., it was not error for the district court to give the instructions, it is simpler to acknowledge the instructions given were legally appropriate. And since there was no error, there necessarily was no reasonable probability the jury imposed fault based on anything less than a "but-for" causal relationship between DeBrot's negligence and the injuries and damages.

Regardless, we note under this case's facts, the error DeBrot claims could not possibly have required reversal. The causation evidence was that treatment within the standard of care probably would have averted the stroke. For the jury to conclude DeBrot's negligence had anything to do with the stroke, it would have to have concluded the stroke would not have occurred if DeBrot had recognized it was imminent and taken appropriate measures to address the situation. We affirm on this issue.

IMPROPER CLOSING ARGUMENT

DeBrot next argues he deserves a new trial because plaintiffs' counsel improperly suggested during closing that the verdict would have either a beneficial or adverse impact on the community depending on how the jury found. Counsel tied the verdict to whether the jury wanted "safe medicine or unsafe medicine." We agree this was error but hold it was harmless.

18

*Additional Facts*

In closing arguments, plaintiffs' counsel listed the "available and affordable tools and tests and treatments that were not used or performed" during the two visits in December. He claimed these were "designed . . . to prevent tragedies such as occurred in this matter." Counsel faulted DeBrot for not listening to Barbara's carotid artery for signs of stenosis and for not using a blood pressure monitor. He argued a carotid Doppler is "completely safe" and noninvasive. He criticized DeBrot for failing to consult a neurologist about the "safest thing" to do under the circumstances. And he blamed DeBrot for not simply admitting Barbara to the hospital for tests, which he argued would have been "the safest thing to do." Counsel also claimed DeBrot prevented Barbara from "participation in her own safety" by failing to talk to her about the risks of not running the tests. Finally, he faulted DeBrot for deciding to "guess instead of test," failing to fully explore Barbara's symptoms, and failing "to use the common sense test" when he dismissed Barbara's concern about having a stroke without investigation.

This standard of care argument culminated with counsel's remark: "When we establish standards of care in this case, as a jury *you'll want to decide if you want safe medicine or unsafe medicine.*" (Emphasis added.) Defense counsel objected at this point, but the court overruled it because "[t]he jury [had] been instructed to follow the instructions." Plaintiffs' counsel then returned to the "safety" theme several more times, by asserting:

> "The evidence is clear. DeBrot broke several basic and foundation cornerstones of the rules of safe medical practice which resulted in the care being below the standard of care. . . .
>
> "We presented evidence that doctors should always provide patients a margin of safety. We presented evidence that doctors must always err on the side of safety. Don't

19

drive right on the edge of the road. Give yourself a margin of safety. Don't follow the truck right behind it. Give yourself a margin of safety. . . . And then you can never needlessly endanger a patient. . . .

"And what was the danger of sending her for the carotid duplex test? No danger. . . . What was the danger of picking up the phone and saying this woman thinks she has a stroke, doctor neurologist, here's what I've done, do you think I've missed any steps . . . [?]"

Counsel summarized why the jury should find DeBrot liable by stating, "So Barbara Castleberry's life story is in your hands. You'll either right a wrong or you'll say with your verdict that DeBrot was practicing safe and reasonable [medicine] and within the standard of care." Later, during a narrative about Barbara's life leading up to the stroke, counsel said "a reasonable doctor who wants to err on the safe side" would ask

"what is the cause of this[?] And if he rushes to judgment and says it's carpal tunnel syndrome, he better remember, you know, you can have carpal tunnel syndrome and a TIA at the same time, I haven't ruled anything dangerous out, I have played God, I have chosen this disease for this woman without being safe, no margin of safety, no erring on the safe side."

In rebuttal, plaintiffs' counsel quoted extensively from Yatsu's testimony including, "[t]o say that dizziness and all of [Barbara's] symptoms are not stroke related" was not "safe medicine." He argued, "Our effort here was to educate you, not to scare you, as somebody says, but to educate you so you could make a fair, appropriate, safe decision about whether or not he acted within the standard of care." Counsel then told the jury,

"Here's a piece of information we believe we've provided to you, not to scare you but to put you on notice as to the knowledge that Dr. DeBrot had. 60.2 percent of strokes

20

occur in women. 60.2 percent occur in women. When you go to the doctor's office, did you know 60.2 percent were going to be on your side?"

Counsel reminded the jury Barbara asked DeBrot about stroke risk, but there was no mention of that inquiry in her medical records. He argued if DeBrot went on vacation the next doctor would not know Barbara had been concerned about stroke. He asked the jury, "How is that safe and prudent care?"

Then, counsel addressed DeBrot's failure to recheck Barbara's blood pressure after a high initial reading during the December 19 consultation. He argued the medical literature established this should have been done, "[a]nd would anybody think that they'd want the doctor to treat somebody against the guidelines? Is that what you would think would be reasonable, prudent, safe, on-the-side-of-the-patient medicine . . . ?"

In analyzing the closing arguments on appeal, the panel did not decide whether the "safe medicine or unsafe medicine" comment was improper but concluded instead it "was arguably a prohibited golden rule argument." *Castleberry*, 2016 WL 1614018, at *11. Nevertheless, the panel reasoned reversal was not required, even if the comment was improper, because DeBrot "failed to argue, let alone establish a likelihood, that this improper remark . . . changed the result of the trial." 2016 WL 1614018, at *11.

*Standard of Review*

In civil cases, "counsel are granted latitude in making arguments. '"This court has consistently followed the general rule against imposing narrow and unreasonable limitations upon argument of counsel made to the jury."'" *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 942, 399 P.3d 148 (2017). But if counsel injects error into the trial by exceeding that latitude, a court must determine whether that error prejudiced a party's

21

right to a fair trial. 306 Kan. at 943. The test is whether "'there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" 306 Kan. at 943 (quoting *Siruta v. Siruta*, 301 Kan. 757, 772-73, 348 P.3d 549 [2015]).

*Discussion*

DeBrot argues the panel erred by not reversing the jury verdict and ordering a new trial because the "safe medicine or unsafe medicine" argument improperly asked the jury to base its decision on achieving a social goal and was not harmless since it was tied to plaintiffs' litigation strategy. Plaintiffs argue the comments were proper because they were directed at the jury's decision on the standard of care, and there was evidence DeBrot violated that standard of care by practicing unsafe medicine.

The court addressed a similar comment in *Bullock*. There, plaintiff's counsel argued:

> "'*Justice is an ideal that is given meaning by your values. You decide what justice is based on what you feel and what values you have, and you learn those values within your community*. And your verdict, whatever your verdict is, *the justice you decide upon will reflect your values and the values of this community. It will speak to the values of* how an employer should treat an employee, what kinds of conditions of work and employment . . . *a person in this community is entitled to*, and that's really important stuff.' (Emphases added.)" 306 Kan. at 942.

The *Bullock* court concluded the comment was improper because the "'community values'" reference "'suggested the jury could improperly decide the case based on something other than the law contained in the instructions.'" 306 Kan. at 945. It compared the comment to an erroneous jury instruction in a different case, telling the jury to "'act upon [its] conscientious feeling about what is a fair result in this case and acquit the

22

defendant if you believe that justice requires such a result.'" 306 Kan. at 944 (quoting *State v. McClanahan*, 212 Kan. 208, 209, 510 P.2d 153 [1973]). The court further reasoned that commentary about the verdict's reflection of the community's "'values of how an employer should treat an employee'" was improper because "[j]uries are tasked with deciding cases based on the evidence presented by counsel and the law instructed by the court, not with protecting their communities through their verdicts." 306 Kan. at 945.

In *Sledd v. Reed*, 246 Kan. 112, 114, 785 P.2d 694 (1990), the court held it was improper to argue "'[i]f we hold Doctor Reed responsible and other doctors responsible who do their best and who make their best judgments as they treat these kinds of cases, no one will answer these calls.'" The court reasoned the argument was calculated to inflame jurors' passions or prejudices by predicting their verdict's consequences. The argument was "inappropriate, [and] had no bearing upon the issues before the jury." 246 Kan. at 116-17.

The "safe medicine or unsafe medicine" argument is similar to those in *Bullock* and *Sledd*. It invited the jury to determine whether DeBrot's conduct met the standard of care based on whether it desired "safe medicine or unsafe medicine," instead of the evidence and the law. The evidence included expert testimony that, e.g., DeBrot's failure to "err on the safe side" contributed to the experts' opinions that he deviated from the standard of care. But it did not go to the jury's values about whether they wanted "safe medicine or unsafe medicine." As phrased, the comment implied the jury's decision could reach beyond the confines of the case and impact medical care elsewhere. As presented in this case, the comments were error. See *Biglow v. Eidenberg*, 308 Kan. ___, ___ P.3d ___ (this day decided), slip op. at 29 (holding district court within discretion to prohibit during closing argument a "broad and abstract statement that a physician's job is to 'take care of people and help people, but really the safety'" because it did nothing to establish a deviation from the standard of care).

23

The next question is whether there is a reasonable probability this error affected the verdict. The panel concluded reversal was not required because DeBrot failed to argue the remark prejudiced him. DeBrot argues the panel improperly placed the burden on him and was wrong about whether he asserted prejudice, directing our attention to his Court of Appeals brief. Plaintiffs argue any error was harmless.

We agree with DeBrot that the panel misallocated the burden of proving harmlessness. In *Bullock*, the court took its standard of review from the reasonable probability test articulated in *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011). *Bullock*, 306 Kan. at 944. In analogous situations using the test in the jury instruction context, we have made clear the party benefiting from the error has the burden to show harmlessness when the other party objected to an erroneous instruction. *Siruta*, 301 Kan. at 772. In this case, if anyone benefitted from the improper argument it was plaintiffs, so they have the burden to demonstrate the error was harmless.

That said, we hold the panel correctly concluded any error was harmless. In *Sledd*, the improper argument that liability would deprive the community of doctors did not require reversal because the matter was "thoroughly tried" by competent counsel; the central issue was whether the doctor committed malpractice; the trial was several days long and consisted of over 600 pages of testimony; the experts were well respected; the jurors heard the testimony and asked questions during deliberations that showed they understood the issues; and the jury was instructed to disregard arguments not based on the evidence. 246 Kan. at 117-18; see also *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1028-29, 850 P.2d 773 (1993) (holding counsel's erroneous closing arguments were harmless because "[t]he charges of counsel misconduct . . . certainly are not of the same magnitude as those complained of in" *Walker v. Holiday Lanes*, 196 Kan. 513, 413 P.2d 63 [1966], and *Glynos v. Jagoda*, 249 Kan. 473, 819 P.2d 1202 [1991]).

24

DeBrot argues the comment about patient safety "represented the linchpin of plaintiffs' entire litigation theory." He argues this theme was the "final step in a 'Reptile Litigation' strategy," which he argues is designed to encourage juries to decide cases "based upon fear, generated by plaintiff's [*sic*] counsel, that a verdict in favor of the defendant will harm the safety of the community, and thus the juror." The differences between *Sledd* and this case lend some merit to DeBrot's argument.

While the *Sledd* court viewed the improper commentary as divorced from that case's central issue, here the remark went directly to its core—whether DeBrot violated the standard of care. It did so by tying the answer to the jurors' personal values on how "safe" medical practice should be. Plaintiffs' counsel urged the jury to make a "safe decision," which lends credence to DeBrot's claim that the remark was strategic. And the district court's failure to sustain DeBrot's objection did nothing to mitigate the prejudice from that remark.

Nevertheless, we conclude there is no reasonable probability this error affected the trial's outcome in light of the entire record. The call to decide the case on improper grounds was much more subtle than those in *Sledd* and *Bullock*. And when made, the court promptly noted the jury had been instructed to follow the court's instructions. Those instructions properly directed the jury to base its standard-of-care findings on expert testimony, which focused on the care DeBrot rendered rather than community values. Finally, and as discussed with the next issue, "patient safety" was a theme embedded throughout the expert testimony—frequently without objection. This tied the "safety" theme—mentioned during closing arguments by both sides—within the context of explaining that testimony. Accordingly, the error was harmless.

25

PROPER ADMISSION OF EXPERT TESTIMONY

The final issue is whether plaintiffs' expert testimony impermissibly redefined the legal duty a physician owes to a patient. We hold there was no error.

*Additional Facts*

DeBrot identifies five instances in which the district court overruled objections to testimony he believed redefined the standard of care. Except for the fifth instance, DeBrot objected on grounds the questions misstated the legal standard. In the fifth, he objected that the witness was not designated as an expert.

In the first instance, the court ruled it would permit a question-and-answer exchange from DeBrot's deposition to be read in which plaintiffs' counsel asked DeBrot "[o]n December 6th, were you permitted to needlessly endanger patients?"

Second, the court allowed Miser to testify he took "into consideration the caveat that a doctor is to never needlessly endanger a patient," must provide a margin of safety, and must err on the side of safety in his "opinion that [DeBrot] deviated from the standard of care . . . ."

Third, the court permitted plaintiffs' counsel to ask defense expert Davis how it was "safer for [Barbara] not to have" her carotid artery listened to and whether that was "a safer way to treat the patient." Davis responded, "It was appropriate." Plaintiffs' counsel continued, asking "[w]as it safer?" Davis responded that safety is important, but everything was appropriate and within the standard of care because listening to the carotid arteries was not expected and "not considered good medicine" at each patient contact.

26

Fourth, during plaintiffs' cross-examination of defense expert Kaplan, the court permitted plaintiffs' counsel to elicit testimony that Kaplan "err[ed] on the conservative safe side" in arriving at his opinions.

And, fifth, the court permitted a physician who treated Barbara before DeBrot to testify he was "trying to avoid needlessly endangering" her while treating her.

Although these are the particular instances that drew DeBrot's objections, the panel noted,

> "the record reflects numerous occasions where similar evidence was introduced . . . without objection. Indeed, Dr. Miser testified repeatedly, without objection, that the standard of care required the defendant to take 'safety steps,' that safety was 'the number one factor in treating people,' that the standard of care required the defendant to have good reason to 'deviate from these safety rules' and fail to obey 'safety features,' and that the standard of care involved 'the safe practice of medicine.'" *Castleberry*, 2016 WL 1614018, at *14.

The panel concluded the district court did not err by permitting these questions because they went to the standard of care, which is defined by experts, while the duty of care is defined by law. The panel held the evidence "defined the applicable standard of care, as an expert witness is allowed—and required—to do," so the district court did not abuse its discretion in admitting it. *Castleberry*, 2016 WL 1614018, at *15.

*Standard of Review*

Evidentiary rulings follow a multistep analysis:

27

"""Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted].'" *Mooney*, 283 Kan. at 620 (quoting *State v. Gunby,* 282 Kan. 39, 47, 144 P.3d 647 [2006]).

"'[T]he question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard.' *Shadden,* 290 Kan. at 817 (citing *State v. Reid,* 286 Kan. 494, 507-09, 186 P.3d 713 [2008]). The next step is to determine which additional rules of evidence or other legal principles govern admissibility. 'On appeal, this conclusion is reviewed de novo.' 290 Kan. at 817 (citing *Boldridge v. State*, 289 Kan. 618, Syl. ¶ 10, 215 P.3d 585 [2009]). "'[E]videntiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question."' *Mooney*, 283 Kan. at 620 (quoting *Gunby*, 282 Kan. at 47)." *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 69-70, 274 P.3d 609 (2012).

"Typically the admission of expert testimony is reviewed under an abuse of discretion standard and depends on finding that the testimony will be helpful to the jury." *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 444, 228 P.3d 1048 (2010).

Error in the admission or exclusion of evidence does not warrant reversal unless "there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *State v. McCullough*, 293 Kan. 970, 981-82, 270 P.3d 1142 (2012).

*Discussion*

DeBrot argues the judgment must be reversed because the district court admitted expert testimony he claims redefined the duty of care by supplanting reasonable care under the circumstances with a more onerous duty, e.g., to "err on the conservative, safe side." He claims the testimony was not "relevant to questions of fact involving the legally defined standard of care" and instead redefined the duty of care "into a duty to do 'whatever is safest.'"

At the time of trial, K.S.A. 60-456(b) provided,

> "If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

The panel did not perform a relevance analysis, but instead framed the issue as whether the district court abused its discretion admitting the opinion testimony "under K.S.A. 2015 Supp. 60-456." *Castleberry*, 2016 WL 1614018, at *14. The panel reasoned that since expert testimony was required to prove the standard of care, testimony that this standard involved "'err[ing] on the side of safety'" did not "create a new legal standard but instead defined the applicable standard of care, as an expert witness is allowed—and required—to do." 2016 WL 1614018, at *15. The panel's analytical path was sound.

When a district court permits a witness to testify as an expert, "the court cannot regulate the factors or mental process used by the expert in reaching his opinion or conclusion on the case. The factors and mental processes used by the expert 'can only be challenged by cross-examination testing the witness' credibility.'" *Pope v. Ransdell*, 251

29

Kan. 112, 123, 833 P.2d 965 (1992) (quoting *City of Bonner Springs v. Coleman*, 206 Kan. 689, 695, 481 P.2d 950 [1971]).

In *Schlaikjer v. Kaplan*, 296 Kan. 456, 469, 293 P.3d 155 (2013), the trial court granted a motion in limine that "testimony based on physician treatment preferences" could not be introduced on direct examination, but might be explored on cross-examination to test credibility. The *Schlaikjer* court affirmed the district court's decision "insofar as it addressed physician preference testimony admitted on direct examination for the purpose of proving the applicable standard of care." 296 Kan. at 470. The *Schlaikjer* court relied on *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 510 P.2d 190 (1973), in which the court affirmed a directed verdict based on plaintiff's failure to adduce testimony sufficient to establish the applicable standard of care or breach when the expert testified only what his practices were with respect to patients in circumstances similar to the plaintiff's. But the expert "stopped short of testifying that defendant's methods constituted unsound medical practice," so the evidence was "'insufficient to establish . . . the "degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices or similar communities."'" *Schlaikjer*, 296 Kan. at 470 (quoting *Karrigan*, 212 Kan. at 50).

In *Pope*, the conservator for a minor child born with developmental disabilities sued the mother's doctor for negligent obstetrical care. A defense expert testified the injuries were caused by the mother's drug use. On cross-examination, plaintiff's counsel attempted to ask whether it was "possible" for various conditions to cause injury. Defendant objected that an expert's opinion testimony must be based on reasonable medical probabilities, not possibilities. The district court sustained the objection. On appeal, the court drew a distinction between opinions that must be "within a reasonable medical probability," and the "factors or mental processes used by the expert in reaching

30

his opinion or conclusion on the case." 251 Kan. at 123. The court held the cross-examination would have been appropriate, so the district court erred in prohibiting it. 251 Kan. at 124.

The testimony to which DeBrot objects as misstating the legal standard is like the testimony in *Pope.* It tended to show—albeit in general terms—the conduct required by the legal duty flowing from DeBrot to Barbara. It did not tend to show DeBrot was subject to a standard other than the standard applicable to a physician in like circumstances. Moreover, the claim that it redefines the standard of care to impose a duty of ultra-vigilance is dubious. Like the cross-examination questions in *Pope*, and unlike the physician-preference testimony in *Karrigan*, the questions were asked within the context of the witnesses' overarching opinions that DeBrot deviated from the standard of care. The questions about "margin of safety" and "erring on the safe side" illustrate the experts' mental processes in reaching their conclusions.

Because this testimony was within the scope of permissible expert testimony, the district court did not abuse its discretion admitting it.

Neither was there an abuse of discretion overruling DeBrot's objection that a treating physician should have been designated as an expert before being permitted to testify he was "trying to avoid needlessly endangering" her while treating her. The testimony related to that doctor's own actions and did not purport to establish the standard of care DeBrot owed to Barbara under the circumstances or whether DeBrot deviated from the standard. Even if inadmissible for some other reason, the testimony was not objectionable for lack of an expert witness designation. See K.S.A. 60-404 (specific ground for objection must be stated); *State v. Robinson*, 306 Kan. 1012, 399 P.3d 194 (2017) (holding appellant could not argue on appeal grounds for exclusion of evidence on appeal that were not included in trial objection).

31

Affirmed.

* * *

BEIER, J., concurring:  I agree with the majority's ultimate outcome and much of its reasoning on this case. Still, I must write separately because I cannot agree with its application of our Rule 8.03 (2018 Kan. S. Ct. R. 53)—soon to be amended for overdue clarification and improvement—to prevent consideration of other issues the defendant pursued before the Court of Appeals. Ultimately these other issues cannot carry the day for the defendant, but I believe he has a right to have them analyzed by the full court.

Under the current version of Rule 8.03(h)(1), this court may choose when it grants a petition for review to limit the issues it will consider. We did not make that choice in this case. In such a situation, as quoted by the majority, "the issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review . . . allege[s] were decided erroneously by the Court of Appeals." In addition, the rule provides, "In civil cases, the Supreme Court may, but need not, consider other issues that were presented to the Court of Appeals and that the parties have preserved for review." (2018 Kan. S. Ct. R. 56.)

As the majority also acknowledges, defendant Brian L. DeBrot, M.D., filed a petition for review that specifically said that he believed "all of the issues raised in this appeal should be considered." He then said that specific issues "particularly" merited review. It is only this latter set of issues that the majority is willing to entertain.

The majority is correct that DeBrot failed to "list, separately and without argument," the issues that did not fall into the category of "particularly" meriting review

32

as "additional issues decided by the district court which were presented to, but not decided by, the Court of Appeals, which the petitioner wishes to have determined if review is granted" under Rule 8.03(a)(4)(C) (2018 Kan. S. Ct. R. 54). But I do not think that this minor deviation is deserving of the ultimate punishment of being ignored. It may be a bit inconvenient for us to review DeBrot's brief filed before the Court of Appeals and the panel's decision to determine the additional issues his petition for review was referring to when he said he believed that "all of the issues raised in this appeal should be considered," but mere inconvenience is hardly a worthy rationale for the majority's rigidity.

Thus I would reach the merits on all of the preserved issues that DeBrot raised in the Court of Appeals. His petition for review's reference to his belief that all issues should be considered plus his list of issues "particularly" meriting review qualified under Rule 8.03(a)(4)(C) (2018 Kan. S. Ct. R. 54) as a "statement of the issues decided by the Court of Appeals of which review is sought," and we should not treat certain issues as "not presented or fairly included in the petition" for review. Our procedural stinginess is simply unwarranted, particularly when we take up an issue on which the plaintiffs did not file a cross-petition, i.e., the Court of Appeals panel's decision that causation instructions were erroneous.

The additional issues on which DeBrot sought review are not nothing. They are numerous and, in at least a few cases, meritorious. They are:

- Whether a jury instruction should have been modified to say that, in a medical malpractice case, causation must be established through expert testimony.
- Whether it was error to instruct the jury that plaintiffs were not at fault as a matter of law.

33

- Whether plaintiffs' counsel's closing argument about DeBrot probably being rushed during Barbara Castleberry's December 19, 2007, visit because he wanted to get to a holiday party was error.

- Whether plaintiffs' counsel unnecessarily called for two bench conferences during defense counsel's closing argument.

- Whether plaintiffs' counsel's use of a denial in response to a pretrial request for admissions in an effort to impeach DeBrot was error.

- Whether plaintiffs' counsel's questions regarding informed consent were error.

- Whether it was error to permit plaintiffs' counsel to read a sentence from a letter written by an author of an article regarded by an expert witness as authoritative, when the letter was solicited by plaintiffs' counsel and was not admitted into evidence.

- Whether it was error to permit plaintiffs' counsel's cross-examination to exceed the scope of direct testimony.

- Whether several other pieces of evidence should have been excluded or lines of questioning prohibited, some because they allegedly violated limine orders; these issues focused on questioning about another doctor's personal treatment preference, a mention of DeBrot's credibility, a line of questioning about conversations between defense counsel and a defense expert, an expert's reference to the annual number of deaths attributable to medical error, questions posed to Castleberry's son about overheard conversations among health care personnel, and other questions suggesting that there was an inappropriate relationship between DeBrot and a nurse.

- Whether 17 exhibits should have been admissible under the learned treatise exception to the hearsay rule.

- Whether cumulative error requires reversal and remand for a new trial.

34

The first of these issues untouched by the majority concerns the district judge's refusal to modify Instruction 8 at DeBrot's request to say that a medical malpractice case not only requires expert testimony to establish the standard of care but also to establish causation. DeBrot is correct that this is Kansas law. See *Sharples v. Roberts*, 249 Kan. 286, 292, 816 P.2d 390 (1991); *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). He is also correct that even an otherwise factually and legally appropriate instruction can be misleading and erroneous if it is incomplete. The district judge's refusal to modify the instruction was error, and the Court of Appeals panel was wrong when it employed an alternative, nonmeritorious argument made by DeBrot on this issue as a straw man to rule in plaintiffs' favor.

I would not hold that this error is reversible standing alone. My review of the trial record persuades me that causation was simply not the fulcrum of this case. Rather, it turned on identification of the standard of care and on whether DeBrot breached it. Nearly all of defense counsel's lengthy closing argument was focused on standard of care and breach; it included a very brief mention of damages near its conclusion. On causation, defense counsel was silent. He no doubt appreciated that there was never a question about Castleberry's subsequent stroke causing all of her and her heirs' damages. He correctly focused on the true question: Should DeBrot have seen the stroke coming and reacted in a way that would have prevented it or minimized its ultimately disastrous consequences?

Regarding the issue of whether plaintiffs' counsel's argument about DeBrot's probable hurry to a holiday party was error, I would agree with the Court of Appeals panel that it was. The comment was unsupported in the evidence and effectively encouraged the jury to rely on impermissible inference stacking. *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017) (inference stacking prohibited); *State v. Akins*, 298 Kan.

592, 601, 315 P.3d 868 (2014) (error to comment on facts not in evidence). I would hold that this error is not reversible standing alone.

I would part company from the Court of Appeals on whether plaintiffs' counsel should have been permitted to read from the letter from the author of an article regarded as authoritative by an expert. A letter solicited by counsel is not a learned treatise, even if the letter is written by a learned individual whose work is respected and relied upon by an expert witness. See K.S.A. 60-460(cc); see also *State v. Baldwin*, 36 Kan. 1, 17, 12 P. 318 (1886) (authors do not write under oath; "grounds of belief and processes of reasoning cannot be tested by cross-examination"), cited in *Wilson v. Knight*, 26 Kan. App. 2d 226, 229-30, 982 P.2d 400 (1999). Again, however, I would hold that this error is not reversible standing alone.

I would hold that additional error occurred when plaintiffs' counsel questioned Miser about his preference for whether he or a nurse performed a review of a patient's systems. The Court of Appeals initially said that the record was insufficient to support this appellate claim, but, if there was error, it was not reversible. I agree with the second part of its holding because the error was cured in part by counsel's rephrasing of a question after a defense objection; the error is not reversible standing alone.

I would also agree with the Court of Appeals that a reference to the number of deaths attributable to medical error by expert William Miser, M.D., was a violation of the district court's limine order. Again, I would hold that this error is not reversible standing alone. It was brief and isolated, and no participant in the trial ever returned to it.

This brings me to cumulative error. *Walker v. Holiday Lanes*, 196 Kan. 513, 520, 413 P.2d 63 (1966) (Cumulative error is to be viewed "in relation to the record in its entirety" and necessitates reversal when the "various [errors] have so permeated and

tainted the entire proceedings that [a party] has been deprived of the fair trial to which every litigant is entitled.").

I would hold that the combination of the five errors I have listed with the error identified by the majority—plaintiffs' counsel's improper linkage between the verdict and whether the jury wanted "safe medicine or unsafe medicine"—does not require reversal under the cumulative error doctrine. But I think this case presents a close call, in part because I am also troubled by what a lawyer from an earlier generation might refer to at least two instances of "sharp practice" by plaintiffs' counsel. Although these instances fell short of the standard for an appellate court to identify them as legal error, they nevertheless would have had a tendency to undermine the overall fairness of the trial. Plaintiffs' counsel inappropriately questioned Castleberry's son about the fact that there were things he could not say in front of the jury, when the limitation on his testimony originated in a proper order in limine. This was too clever by half, as any alert juror would inevitably suspect that important, and possibly damning, information was being concealed. And plaintiffs' counsel's questions about any relationship between DeBrot and the nurse are simply not amenable to characterization as intended to elicit relevant evidence.

LUCKERT and JOHNSON, JJ., join the foregoing concurrence.

37